Lawrence M. POWERS, Plaintiff,

v.

BRITISH VITA, P.L.C., Rodney H. Sellers, and Francis J. Eaton, Defendants.

No. 93 Civ. 3442 (LMM).

United States District Court, S.D. New York.

Feb. 15, 1994.

Henry P. Wasserstein, Skadden, Arps, Slate, Meagher & Flom (Robert L. Meyers, of counsel), New York City, for plaintiff Lawrence M. Powers.

Russell E. Brooks, Milbank, Tweed, Hadley & McCloy (Susanne M. Toes, Michael James, Alisa Odeen, of counsel), New York City, for defendants British Vita, P.L.C., Rodney H. Sellers, and Francis J. Eaton.

### MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Lawrence M. Powers filed this action on May 21, 1993, invoking the jurisdiction of this Court based on diversity jurisdiction, 28 U.S.C. § 1332, and, with regard to Count II of the Complaint, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Pursuant to notice of motion filed on August 31, 1993, Defendants British Vita, P.L.C. ("BV"), Rodney H. Sellers, and Francis C. Eaton, move this Court to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and further move this Court to impose sanctions on Plaintiff for filing a frivolous Complaint pursuant to Rule 11. For the reasons set forth below, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted and their motion for Rule 11 sanctions is denied.

### I.

Taking the material facts alleged in the Complaint as true, *see Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991), the facts are as follows. Plaintiff Lawrence M. Powers is an attorney and a citizen and resident of New Jersey. At all times relevant to this action, Plaintiff was a director,

shareholder, and holder of options to purchase additional shares of common stock of Spartech, a publicly held Delaware corporation whose stock and debentures are listed on the American Stock Exchange. Plaintiff became Spartech's Chairman of the Board in 1977 and became Chief Executive Officer as well in 1983. BV is a publicly held United Kingdom corporation listed on the London Stock Exchange with its principal place of business in the United Kingdom. Defendant Rodney H. Sellers, a citizen and resident of the United Kingdom, is Chief Executive of BV, a member of BV's board of directors, and also a member of Spartech's board of directors. Defendant Francis C. Eaton, a citizen and resident of the United Kingdom, is Deputy Chief Executive of BV, a member of BV's board of directors, and also a member of Spartech's board of directors.

Spartech is in the plastics processing business. In 1968, when Spartech first went public, Plaintiff became its counsel, a shareholder, and a member of its board of directors. As noted, he eventually became both Chairman of Spartech's board of directors and its Chief Executive Officer, and, in addition, he owned, by 1989, 22% of Spartech's outstanding securities. In late 1985, Plaintiff contacted a friend, Thomas L. Cassidy, for advice regarding Spartech's capitalization needs. Cassidy, on behalf of a group of California limited partnerships affiliated with Trust Company of the West ("TCW"), invested in Spartech. In a series of transactions from 1985 to 1989, TCW purchased over 27% of Spartech's common stock on a net investment of $22 million; the common stock was in a form known as "quasi-equity" with anti-dilution provisions to protect TCW's percentage interest in the event of the issuance of new equity securities. TCW and Plaintiff formulated a shareholders' voting agreement whereby Plaintiff designated four, and TCW was authorized to designate two, members of Spartech's six-person board of directors. In addition, both Plaintiff and TCW retained the right to veto any new

financing transactions, acquisitions, or sales of securities, with the dual purposes of ensuring that Plaintiff retained control of the company and TCW remained in a position to protect its investment. In 1985, at the time of TCW's initial investment, Plaintiff entered into an employment agreement that granted him 200,000 options on shares of common stock annually and a deferred payment arrangement on additional shares owned outright. The agreement also contained a "change of control" severance pay commitment. In 1988 and 1989, updated versions of the employment agreement were approved. Under Plaintiff's stewardship, Spartech's sales and operating earnings grew from 1983 to 1989; the company expanded into a number of different aspects of the plastics business, including the building of a six-plant, rigid plastic sheet extrusion division.

In late 1988, Spartech sought capital to begin paying down debt and distributing funds to its shareholders.[1] Spartech disseminated a brochure offering to sell its rigid plastic sheet division for $80 to $100 million. Plaintiff, along with the entire Spartech board of directors, had no intention, at the time this offering was distributed, of selling Spartech itself or any of its other divisions. Defendant BV learned of the competitive bidding process · initiated through the offering brochure and began negotiations with Plaintiff. BV's intent, however, was to obtain control of Spartech. Plaintiff subsequently informed BV that he would entertain an offer for Spartech in its entirety reflecting its market value—approximately $130 million—but that he would not

> permit BV to position itself to take control of Spartech with a small investment that would leave plaintiff without an investment vehicle and as a subordinate employee and minority investor with unmarketable shares in a thinly traded company.

Compl. ¶ 25. In the face of this obstacle to its real intent, and after having a number of its offers rejected, BV

---

1. The desire to distribute funds was prompted, at least in part, by TCW's expressed desire to eventually effect an orderly liquidation of its interest in Spartech.

formulat[ed] a secret plan which involved (a) obtaining an investment foothold in Spartech by appearing to accept plaintiff's conditions, (b) then ousting plaintiff from his management and control position and (c) thereafter diluting most of plaintiff's equity position before its intrinsic value could be realized.

*Id.* ¶ 26. In order to effectuate their scheme, Defendants courted Plaintiff for a year, and eventually agreed with Plaintiff on a plan to purchase a stake in Spartech.

In September 1989, BV and Spartech executed three interrelated agreements (together the "Original Agreements"), detailed *infra*, whereby BV agreed to acquire a 29% ownership stake (ultimately convertible to 34%) in Spartech for an investment of $23.6 million. The Original Agreements became operative upon approval by Spartech's shareholders in December 1989. According to Plaintiff, however, Defendants never intended to honor the Original Agreements. This bad faith was evinced, Plaintiff maintains, by Defendants' request, acquiesced in by Spartech, that the following paragraph be deleted from a September 5, 1989, draft of a press release announcing the transaction:

> The British Vita investment is occurring without any change in control at Spartech. They will take two board seats and be subject to the management-key investors voting trust [the Voting Agreement] structure in existence since 1985. This system will ensure that Spartech grows and develops as an independent public company in the U.S.

Compl. ¶ 45.

Pursuant to BV's proposed investment in Spartech, BV, TCW, and Plaintiff negotiated a new voting agreement, dated September 7, 1989 ("Voting Agreement"), granting Plaintiff the right to designate four of the seats on Spartech's newly expanded eight-person board of directors, and giving BV and TCW each the right to designate two board members.[2] The Voting Agreement maintained Plaintiff's veto right over major investments in Spartech by providing that Plaintiff had to approve any sale, merger, or takeover, or any issuance of more stock to BV. In addition, provisions of the Voting Agreement guaranteed that, as long as it was in effect, Plaintiff could solicit competing offers for any attempt by BV to purchase large blocks of Spartech stock or any other BV offer that would effect a change in control of Spartech.

Spartech and BV entered into an Investment Agreement on September 8, 1989. BV promised to forego purchasing, for three years, any additional Spartech securities contrary to Plaintiff's veto rights. BV also pledged that, for a period of three years, it would not convert into common stock any preferred Spartech stock it held if that would result in BV owning more than 40% of the outstanding common stock of Spartech. This provision was meant to prevent BV from executing a "creeping takeover" of Spartech. In addition, BV agreed that, for the same three-year period, it would not attempt, over Plaintiff's objections, to consummate a takeover of Spartech.[3]

Spartech and BV jointly executed a Memorandum of Understanding, also on September 8, 1989, that established operating principles to guide the venture into the future. The overarching principle was that the parties to the transaction were establishing a "working partnership" to build a large plas-

---

**2.** BV named Defendants Sellers and Eaton to the board of directors. TCW, which had previously not exercised its right, under the old agreement, to appoint a second director, named another director to join Cassidy on the board. Plaintiff continued to hold the position of Chairman of the Board. Also on the board was Bradley B. Buechler, who had been designated a director by Plaintiff well before Spartech's undertaking with BV. In 1987, Plaintiff appointed Buechler as President and Chief Operating Officer of Spartech. Plaintiff alleges that, unbeknownst to him, Buechler coveted Plaintiff's position as Chief Executive Officer, and subsequently teamed with Defendants Sellers and Eaton to attain his goal. The other two directors appointed by Plaintiff are not identified in the record.

**3.** This provision effectively prevented BV even from buying out TCW's share of Spartech, over Plaintiff's veto, for the same three-year period. *See* Compl. ¶ 43.

tics processing enterprise. The Memorandum called for Spartech to operate independently from BV and to continue under its current management. BV was to contribute to this enterprise in an attitude of "mutual confidence and consultation among professionals," with all transactions to be negotiated "on a fair and reasonable arms-length basis." Compl. ¶ 37 (quoting Memorandum of Understanding). The Memorandum, which provided for the possibility of a separation in the event that matters did not work out as intended, concluded that

> [a]t all times, all parties will deal with each other in an evenhanded, fair and reasonable manner, with the objective of maximizing Spartech's shareholder value.

*Id.* (quoting Memorandum of Understanding).

Immediately upon the execution of the Original Agreements, Defendants began to implement their secret scheme to obtain control of Spartech. Sellers and Eaton convinced Buechler to work with them to undermine Plaintiff's authority. Defendants advised senior executive officers that Buechler would replace Plaintiff at the conclusion of Plaintiff's Employment Agreement. Defendants criticized Plaintiff to his subordinates and other board members, and encouraged Buechler to ignore Plaintiff's direction and to run the company as Buechler saw fit. Potential acquisition targets identified by Plaintiff were roundly criticized by Defendants. Only months after the "working partnership" was undertaken, Defendants suggested that Plaintiff step down from running the most important aspects of Spartech's business in favor of Buechler—in effect, asking him to relinquish control of Spartech's operations. In response to these circumstances, Plaintiff suggested that, pursuant to the separation provision in the Memorandum of Understanding, the "partnership" with BV be dissolved. BV informally agreed to withdraw from Spartech and purchase the rigid plastics division (as had originally been proposed

in Spartech's offering brochure). Months of negotiations followed, during which BV repeatedly expressed its willingness to execute this transaction. At the eleventh hour, BV changed its mind. Plaintiff contends that Defendants fraudulently encouraged this transaction—with no intention of actually executing it—for the purpose of damaging Plaintiff's standing with board members and Spartech's bankers.

Support for Plaintiff's stewardship of Spartech continued to wane. As a result of a recession and losses associated with the purchase by Spartech of another plastics concern,[4] Spartech's common stock fell to $1.00 per share on the American Stock Exchange in the summer of 1991. Consequently, in September 1991, Cassidy demanded that Plaintiff resign as Chief Executive Officer. Plaintiff agreed not to contest Spartech's termination of his employment agreement and indicated a willingness to accept Cassidy's offer of a consulting arrangement. In September 1991, BV convened a special meeting of the Board to postpone the annual stockholders meeting, for the purpose, Plaintiff alleges, of preventing the election of Plaintiff to another three-year term on Spartech's board of directors.

BV advised Plaintiff that it intended to terminate the Voting Agreement. BV hoped to accomplish this by invoking a provision of the Voting Agreement whereby that agreement was terminable if the fair market value of Plaintiff's Spartech shares fell below $2.5 million. BV expressed its willingness to commence litigation to achieve that end. According to Plaintiff, BV proceeded despite its knowledge that "fair market value" as used in the Voting Agreement did not refer to the stock market price on the American Stock Exchange—the price Defendants used to calculate that the pertinent provision of the Voting Agreement had been triggered. Buechler informed Plaintiff that BV would obstruct payment to Plaintiff of his $2 million severance payment—due upon termination of

---

4. The details of this ill-fated transaction are not necessary to resolve the instant motion. It is noteworthy, however, that Plaintiff contends that

although Buechler oversaw this transaction, Defendants blamed Plaintiff when the transaction resulted in losses for Spartech.

Plaintiff's employment agreement without cause—and force Plaintiff to resort to litigation to collect the payment, unless Plaintiff ceded his rights in the Voting Agreement.

In light of the foregoing—which Plaintiff characterizes as "coercion and duress," Compl. ¶ 77—Plaintiff agreed to terminate and cancel the Voting Agreement. A Termination Agreement and a Settlement Agreement were executed between Spartech and Plaintiff in November 1991, wherein Plaintiff formally agreed to terminate the Voting Agreement. Plaintiff also agreed to resign as Spartech's Chief Executive Officer and Chairman of the Board and accept the consulting arrangement first offered to him by Cassidy. The Settlement Agreement deferred payment of Plaintiff's severance. By terms of these agreements, Plaintiff relinquished, *inter alia,* his veto right, described *supra,* and his power to designate four members of the board of directors.

Upon Plaintiff's resignation and termination of the Voting Agreement, BV and TCW assumed shared control of Spartech. Given TCW's expressed desire to ultimately liquidate its share in Spartech, and because, according to Plaintiff, BV is now the sole practical purchaser of that share, TCW defers to BV on all Spartech matters (other than the price at which TCW will sell its share of Spartech). BV, therefore, especially given the relationship Defendants have forged with Buechler, has achieved effective control of Spartech—the result, Plaintiff contends, that BV all along intended.

During the period from September through December 1991, out of a desire to reduce its debt, Spartech formulated, and eventually approved, a plan for recapitalization ("Recapitalization Plan" or "Plan"). Although still a director, Plaintiff was excluded from negotiations concerning the Plan, and did not learn of it until December 1991. Prior to final approval of the Plan, Plaintiff objected on more than one occasion to Spar-

tech's failure to make recapitalization adjustments to minority interests. Spartech's board of directors, including Plaintiff, approved the Plan on May 1, 1992.[5] The Plan called for, *inter alia,* BV and TCW to exchange their subordinated debt and existing preferred stock for newly authorized convertible preferred stock and common stock. In addition, BV was permitted to purchase shares of newly authorized preferred stock (convertible into 750,000 shares of common stock later in 1992) for cash. In all, the Plan provided for the issuance of 3,540,000 shares of common stock and four new series of preferred common stock convertible into 15,024,635 common shares. No shareholders or option holders other than BV and TCW, however, participated in or benefited from the Plan.

As a result of the Plan, BV and TCW strengthened their combined control position in Spartech in exchange for far less value than they gave. Spartech's outstanding common stock after conversion or exercise of rights in all convertible securities and options increased from 14,800,000 to 26,000,000. BV's total share upon conversion is nearly 33.5% (from 5,200,000 to approximately 8,700,000 shares). TCW's share upon conversion is approximately 31% (from 2,400,000 to approximately 8,100,000 shares). Thus, the combined share of Spartech held by BV and TCW is nearly 65%.

The benefits that accrued to BV and TCW from the Plan came at the expense of Plaintiff and other public shareholders and option holders. Prior to the Plan, Plaintiff and the other public holders of Spartech securities collectively held 4,700,000 shares out of 14,800,000 shares (after conversion) of Spartech common stock. These same shareholders now own 4,700,000 shares out of 26,000,000 shares outstanding (after conversion). The total minority position has thus declined from 31% to 18%. Plaintiff's personal position in Spartech, once 22%, has declined to 8% (including options convertible to common stock).

---

5. This fact was alleged in the Complaint filed by the Plaintiff in the instant action in a related case, and was cited in a Memorandum and Opinion issued by this Court in that case. *See* Mem. and Order, No. 92–4000, July 7, 1993, at 9 (citing Compl. ¶ 46).

Plaintiff's actual interest in Spartech, however, has been effectively diluted to 3%, since the exercise price of these options makes it unlikely that it will ever be economical for Plaintiff to actually convert them to common stock.

## II.

Plaintiff asks this Court to, in effect, read his Complaint in Homeric terms. Plaintiff, as King Priam, bravely battles to stave off the marauders invading from across the sea—ably played by Defendants—only to be undone by an acquisitive Trojan Horse. That fateful equine—artfully disguised as a benign exchange of capital for minority control and a promise to permit Plaintiff to remain in power—is welcomed into Plaintiff's kingdom, carrying in its belly a perfidious plot to wrest from Plaintiff his Spartech. Once inside Spartech's corporate walls, however, the betrayal lurking in the beast is unleashed, Plaintiff undermined, and Spartech, like Troy, conquered from within. Plaintiff, afforded an opportunity unavailable to Priam, comes to this Court seeking redress from Defendants on the theories of RICO and common-law fraud. Defendants move to dismiss.

The standard for disposing of a Rule 12(b)(6) motion to dismiss a RICO claim is well-established. Such a motion should be granted "only if 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *McLaughlin v. Anderson*, 962 F.2d 187, 190 (2d Cir.1992) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989) (citations omitted)). On the motion, this Court must "read the facts alleged in the complaint in the light most favorable" to the non-moving party. *H.J., Inc.*, 492 U.S. at 249, 109 S.Ct. at 2905. This approach comports with the traditional standard applied to motions to dismiss generally. *See California Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972); *accord Brass v.*

*American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). Defendants are entitled to dismissal of both the RICO and the common-law fraud counts only if this Court finds beyond a doubt that Plaintiff "can prove no set of facts" to support his claims of entitlement to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## III.

Plaintiff's civil RICO claim, contained in Count II of his Complaint, and alleging violation of 18 U.S.C. § 1962(b), cannot survive Defendants' motion to dismiss. The Court assumes, *arguendo*, that Plaintiff has standing under 18 U.S.C. § 1964 to advance a civil RICO claim. The RICO claim fails, however, because Plaintiff can prove no set of facts consistent with the allegations of the Complaint that would establish that Defendants engaged in racketeering activity in violation of 18 U.S.C. § 1962(b).

The pleading requirements for a civil RICO action in the Second Circuit are well-established.

> [Plaintiff] must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983) (citing 18 U.S.C. § 1962(a)–(c)), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). The dispositive issues in the present case concern the sufficiency of pleading with regard to only two of the foregoing elements—"racketeering activity" and "pattern."

### A.

Plaintiff fails to sufficiently allege racketeering activity. Among the crimes that can constitute racketeering activity for the purposes of a civil RICO claim are: (1) any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) or 18 U.S.C. § 1343 (relating to wire fraud); and (2) "any offense involving ... fraud in the sale of securities" punishable under federal law. *See* 18 U.S.C. § 1961(1)(B) and (D).

### 1.

 Plaintiff's mail and wire fraud claims are not sufficiently pleaded to withstand a motion to dismiss, because Plaintiff has not shown the requisite strong inference of fraudulent intent.[6] Plaintiff classifies as predicate acts constituting racketeering activity eleven "bundles" of wire transmissions, Compl. ¶ 113, and three "bundles" of mailings, *id.* ¶ 115, in which Defendants participated. The elements of mail and wire fraud that Plaintiff must show to survive a motion to dismiss are: (1) a scheme to defraud, and (2) knowing use of interstate mails or transmission facilities to further the fraud. *United ed States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983).

### a.

 An allegation of intentional fraud is necessary for a pleading of a scheme to defraud. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49 (2d Cir.1987) (citations omitted), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled by, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc) (overruling *Beck* on issue of what constitutes "pattern" for purposes of RICO statute). A simple allegation of fraudulent intent is not sufficient, despite the generally liberal require-

ments of Rule 9(b) of the Federal Rules of Civil Procedure concerning pleadings of intent and other "condition[s] of mind." *Id.* at 50 (quoting Fed.R.Civ.P. 9(b)).

On the contrary, a claim must

provide some factual basis for conclusory allegations of intent ... [that] give rise to a "strong inference" that the defendants possessed the requisite fraudulent intent.

*Id.* (citations omitted); *accord Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990). Such a strong inference is established in one of two ways:

[ (1) by] alleg[ing] facts showing a motive for committing fraud and a clear opportunity for doing so[, or (2) w]here motive is not apparent, ... by identifying circumstances indicating conscious behavior by the defendant.

*Beck,* 820 F.2d at 50 (citations omitted). In the case at bar, Plaintiff's pleading on the issue of intent is aptly summarized as follows:

The Complaint alleges that, from the beginning, defendants engaged in a scheme of deception to capture control of Spartech at a price below fair market value. Defendants' goals were pursued under cover of deceit as they made a set of false and fraudulent Promises designed to keep hidden their predatory aims.

Pl.'s Mem. of Law Opp'n Defs.' Mot. to Dismiss at 21 (citations omitted).

### i.

Plaintiff has not alleged facts showing that Defendants, in September 1989, had a clear opportunity to implement their alleged, secret plan. Defendants do not dispute Plaintiff's contention that they harbored a desire to control Spartech.[7] The protective covenants in the Investment Agreement prevent-

---

**6.** Because the mail and wire fraud statutes at issue share the same language in relevant part, this Court will apply the same analysis to both. *See Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987).

**7.** Indeed, as noted *supra,* at one point during the negotiations that preceded the merger, Plaintiff indicated that Spartech as a whole was available for the right price.

ing BV from obtaining a greater share of Spartech for a three-year period surely reflect Plaintiff's awareness of, and attempt to impede at least temporarily, this goal. Plaintiff has not, however, shown that the transaction entered into by Spartech and BV in September 1989 provided Defendants with a "clear opportunity" to effectuate their goal. Plaintiff retained control over four of the eight seats on Spartech's board, while BV had the power to appoint only two directors. The remaining two seats were controlled by TCW, whose investment in Spartech was brokered by Cassidy, a friend of Plaintiff; Cassidy himself filled one of TCW's two seats. Indeed, the Original Agreements negotiated by Plaintiff—a seasoned corporate executive who is also an attorney—carefully delineated the control-sharing arrangement between BV and the other interested parties. Even the most generous reading of these facts does not reveal a clear opportunity at the outset for BV to realize its alleged goal.

**ii.**

Plaintiff, moreover, has not identified circumstances reflecting conscious behavior by Defendants to effectuate their secret plan. When pleading fraudulent intent in this manner, "the strength of the circumstantial allegations must be correspondingly greater [than if pleading intent in the first manner]." *Beck,* 820 F.2d at 50 (citations omitted). The

inference that Plaintiff would have the Court draw is that given the circumstances that Defendants (indisputably) desired to control Spartech and now, allegedly, control Spartech, Defendants executed a fraudulent scheme at Plaintiff's expense. This inference, however, is as thin as the strand of hair from which the tyrant Dionysius suspended the sword over the head of Damocles to demonstrate the precariousness of a king's fortune. Plaintiff's RICO claim is no less precariously perched. There are at least two decisive flaws in Plaintiff's argument that require this Court to conclude that the circumstances, read in Plaintiff's favor, simply do not, as a matter of law, give rise to a strong inference of fraudulent intent. *Cf. id.* (citations omitted).

First, BV's current share of Spartech—which, according to Plaintiff, now stands (including holdings convertible into common stock) at approximately 33.5%—is no greater than the post-conversion share anticipated by the Original Agreements—34%.[8] This fact undermines Plaintiff's allegation that, because of the illegal actions of Defendants, BV has been able to achieve its goal of obtaining control of Spartech in contravention of the Original Agreements.

Second, Plaintiff has not adduced facts to support his claim that Defendants abrogated their contractual obligations.[9] Although

**8.** Plaintiff, not surprisingly, seeks to divert attention from these facts by pointing out that, together, BV and TCW control 65% of Spartech. By the time BV entered into its partnership with Spartech, TCW had already acquired a 27% stake in Spartech. The agreements by which BV purchased a share of Spartech provided that BV would acquire a 29% share, ultimately convertible to 34%. In other words, the original agreements—negotiated by Plaintiff—anticipated that BV and TCW would together have a 61% share of Spartech. This mere 4% difference between the anticipated and actual combined stake of BV and TCW in Spartech hardly gives rise to a strong inference of fraudulent intent. Plaintiff contends that since BV is now the only likely purchaser of TCW's stake in Spartech, BV has effectively acquired control of 65% of Spartech. Plaintiff does not explain, however, how the current situation differs, in this respect, from the state of affairs at the time the Original Agreements were executed. Indeed, Plaintiff negotiated a three-year veto

right over any possible BV buyout of TCW in the Original Agreements. *See* Compl. ¶ 43. Plaintiff relinquished this veto power in the agreements attendant to his termination. If Plaintiff means to say that while in September 1989 he was a possible suitor for TCW's share, he no longer is so, this Court does not see how Plaintiff's willingness or ability (or the lack thereof) to purchase TCW's share signifies fraudulent intent on the part of BV.

**9.** This Court is mindful of the ruling of the Second Circuit, in *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs.,* 985 F.2d 102 (2d Cir.1993), that

the existence of [ ] contractual "rights" does not foreclose the plaintiff['s] RICO fraud claims, nor does it immunize defendants from the consequences of a pattern of direct misrepresentations to plaintiff[ ].

*Id.* at 105. Unlike the defendants in *Standardbred,* Defendants in the instant action did not

Plaintiff does not dispute that he agreed to the termination of the Voting Agreement, he contends that his acquiescence was the result of Defendants' "coercion and duress." Compl. ¶ 77. As the Supreme Court long ago noted, "duress implies feebleness on one side, overpowering strength on the other." *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 300, 62 S.Ct. 581, 587, 86 L.Ed. 855 (1942). An individual alleging economic duress [10]

> must show that he was a victim of a wrongful or illegal act or threat and that this act or threat deprived him of his free will.

*Truglia v. KFC Corp.*, 692 F.Supp. 271, 278 (S.D.N.Y.1988) (citing 13 S. Williston, *A Treatise on the Law of Contracts* § 1617 (3d ed. 1968)), *aff'd*, 875 F.2d 308 (2d Cir.1989); *accord Warnaco, Inc. v. Farkas*, 872 F.2d 539, 546 (2d Cir.1989) (citations omitted). A threat to do an otherwise lawful act may satisfy the requirements for duress if the threat "leaves the victim no reasonable alternative." *Restatement (Second) of Contracts* § 175(1) (1986); *see also Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 757 (2d Cir.1967). However, the threat of commencing or requiring another to commence a civil litigation

> does not usually amount to duress because the victim can assert his rights in the threatened action, and this is ordinarily a reasonable alternative to succumbing to the threat, making the proposed contract, and then asserting his rights in a later civil action.

*Restatement (Second) of Contracts* § 175 cmt.b (1986). Plaintiff's cession to the termi-

nation of the Voting Agreement was not, as a matter of law, the result of duress on the part of Defendants. Plaintiff offers no facts to support the conclusory allegation that Defendants' "hardball" tactics constitute duress.[11] Defendants' alleged threat to force Plaintiff, an attorney, to resort to litigation to collect his severance could not possibly have produced in Plaintiff the requisite paralysis of free will. Plaintiff, moreover, was hardly standing at any economic precipice, given that the market value of his Spartech holdings on the American Stock Exchange exceeded $2 million at the time the threat was allegedly made.

Plaintiff has also failed to adequately allege that Defendants violated either the Investment Agreement or the Memorandum of Understanding. Having relinquished his veto rights, Plaintiff eliminated the barrier set up to prevent BV from purchasing any additional Spartech securities during the three years following the execution of the Investment Agreement. Plaintiff has not sufficiently alleged that BV, even now, has either acquired more than 40% of the outstanding common stock of Spartech or consummated a takeover of Spartech. As to the Memorandum of Understanding, two points are noteworthy. First, that document was executed between BV and Spartech—not BV and Plaintiff. Therefore, the duties of Defendants arising out of it were due to Spartech. On the facts alleged, this Court, as a matter of law cannot conclude that BV did not act "with the objective of maximizing Spartech's shareholder value." Compl. ¶ 37 (quoting Memorandum of Understanding).[12] Second, the Recapitalization Plan, which Plaintiff claims was not the result of "fair

---

hide or misrepresent their goal. Aware of this goal, Plaintiff carefully negotiated the Original Agreements to include the aforementioned power to veto any "change in control" of Spartech initiated by BV for a three-year period.

**10.** There are no facts from which this Court can conclude that any other type of duress is alleged by Plaintiff.

**11.** Plaintiff can hardly be surprised at such tactics, given that both he and Defendants are seasoned corporate "players." Plaintiff, moreover, invited Defendants into the "game," despite his

knowledge that they had expressed interest in acquiring control of Spartech.

**12.** Indeed, to the extent the Court can glean from the record, the value of Spartech common shares (at least when measured by their price on the American Stock Exchange) reached their nadir under Plaintiff's stewardship. Defendants' actions in prompting Plaintiff's resignation seem, if anything, in keeping with the aforementioned objective, rather than in contravention of it.

and reasonable arms-length" dealing, *id.* (quoting Memorandum of Understanding), was in fact approved by Spartech's board of directors—on which Plaintiff was still serving. Significantly, Plaintiff does not allege that the Plan was approved without full notice to either the board or the shareholders who subsequently ratified the board's decision.

### b.

Having resolved the issue of fraudulent intent against Plaintiff, it is unnecessary to decide whether Plaintiff sufficiently pleaded that Defendants made knowing use of interstate mails or transmission facilities to further the alleged fraud. The lack of the requisite intent defeats Plaintiff's mail and wire fraud claims.

### 2.

█ Plaintiff's securities fraud claims are not sufficiently pleaded to withstand a motion to dismiss, because Plaintiff was neither the purchaser nor the seller of securities in the transactions at issue. Plaintiff's Complaint is not entirely clear as to precisely which federal securities laws were allegedly violated by Defendants. Therefore, this Court will undertake an analysis of Defendants' actions in light of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 thereunder, as well as the "fraud in the sale of securities" language of 18 U.S.C. § 1961(1)(D).

### a.

As to the harm allegedly suffered by Plaintiff as a result of BV's purchase of Spartech securities pursuant to the Original Agreements, Plaintiff does not have standing to assert a securities fraud claim. It is well-established that a party asserting a claim under Section 10(b) or Rule 10b–5 must be a purchaser or seller of the securities at issue. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731, 749, 95 S.Ct. 1917, 1923, 1931, 44 L.Ed.2d 539 (1975) (citing *Birnbaum v. Newport,* 193 F.2d 461, 463–64 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct.

1051, 96 L.Ed. 1356 (1952)). Plaintiff asserts that the view of the Supreme Court on this issue is shifting, pointing to Justice O'Connor's concurring opinion (joined by three other Justices) in *Holmes v. Securities Investor Protection Corp.,* — U.S. ——, —— – ——, 112 S.Ct. 1311, 1322–27, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring). In her opinion, Justice O'Connor argued that because

> Congress *has* legislated the elements of a private cause of action under RICO.... [for] *"[a]ny* person injured in his business or property by reason of" a RICO violation[,]

*Holmes,* —— U.S. at ——, 112 S.Ct. at 1327 (O'Connor, J., concurring) (quoting 18 U.S.C. § 1964(c)) (emphasis in *Holmes* ), the traditional limitations placed on plaintiffs in Section 10(b) and Rule 10b–5 actions do not apply in RICO actions. The problem for Plaintiff in the instant action is that the majority in *Holmes* explicitly declined to rule on this broad standing question. *Id.* —— U.S. at —— – ——, 112 S.Ct. at 1321–22. This Court has little choice, therefore, but to apply the clear rule of *Blue Chip.* Because BV purchased Spartech securities from Spartech, not from Plaintiff, Plaintiff does not have standing to advance a Section 10(b) or Rule 10b–5 securities fraud claim under RICO.

█ To the extent that Plaintiff's claim relies solely on the plain language of 18 U.S.C. § 1961(1)(D), and not more specifically on a violation of Section 10(b) or Rule 10b–5, the result is the same. As Judge Patterson made clear in his cogent discussion in *In re Par Pharmaceuticals, Inc. Sec. Litig.,* 733 F.Supp. 668, 683–84 (S.D.N.Y.1990), the language of section 1961(1)(D) must be construed more narrowly than Section 10(b) and Rule 10b–5. Thus, "only fraud that occurs as part of the actual securities transaction" is a predicate act under section 1961(1)(D). *Par,* 733 F.Supp. at 684. Plaintiff, who was not a party to the transaction at issue, does not have standing to assert a securities fraud claim based on that transaction.

### b.

█ Plaintiff also asserts that Defendants violated securities law with regard to Plain-

tiff's purchase of Spartech options in conjunction with his Termination Agreement.

[D]efendants intended to effectuate their fraudulent scheme by secretly devising a shareholder realignment—which ultimately became the recapitalization plan—that improperly increased defendants' ownership percentage while diluting plaintiff's interest. . . . [H]ad plaintiff known about defendants' true intentions, and defendants' efforts to devalue the very securities he was about to purchase—in violation of the [Original Agreements]—plaintiff would not have purchased those restricted securities.

Pl.'s Mem. of Law Opp'n Defs.' Mot. to Dismiss at 32 (citations to Complaint and footnote omitted). Plaintiff may not assert a claim on the basis of this transaction under section 1961(1)(D). *See Par,* 733 F.Supp. at 684. Plaintiff, however, has standing to advance a Section 10(b) claim on these facts. *Id.* at 683–84 & nn. 17 & 19 (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 859–60 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). The Second Circuit has noted that

"[p]lausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out, and that they were not carried out, are sufficient under *Pross* [*v. Katz,* 784 F.2d 455 (2d Cir.1986) ] to state a claim for relief under Section 10(b)."

*Ouaknine v. MacFarlane,* 897 F.2d 75, 80–81 (2d Cir.1990) (quoting *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986)). Nevertheless, although it presents a closer question than the preceding securities fraud claim, Plaintiff's claim with regard to his purchase of Spartech options must also be dismissed. As discussed *supra,* Plaintiff has not advanced "plausible allegations" from which this Court can infer a fraudulent scheme; without the

existence of this scheme, the Recapitalization Plan is stripped of the sinister veneer with which Plaintiff paints it. Plaintiff, moreover, has failed to satisfactorily allege that Defendants had a duty to disclose to Plaintiff, prior to his purchase of the options, the fact that a recapitalization or restructuring was being considered.

### B.

Having rejected on the pleadings all of the predicate racketeering acts alleged by Plaintiff to underlie his RICO claim against Defendants, it is axiomatic that Plaintiff has failed to allege a *"pattern* of racketeering activity" within the RICO statute. *See* 18 U.S.C. § 1961(5).

### IV.

■ Count I of Plaintiff's Complaint does not adequately state a claim for common law fraud. Both parties assume without discussion that the substantive law of New York applies; this Court will proceed accordingly.

The elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff.

*Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987) (citations omitted). Having concluded that Plaintiff has not sufficiently pleaded fraudulent intent for the purposes of his mail and wire fraud claims (*supra,* Part III.A.1.a), and that Plaintiff has failed to plead that Defendants had a duty to disclose the Recapitalization Plan negotiations prior to the execution of Plaintiff's purchase of options pursuant to his termination (*supra,* Part III.A.2.b), this Court must conclude that Plaintiff's common law fraud claim cannot, as a matter of law, lie.[13] In addition, Plaintiff's claim of reliance on Defendants' alleged representation of hav-

---

**13.** Second Circuit authority suggests that the pleading requirements with regard to fraudulent intent are interchangeable for claims of mail and wire fraud, securities fraud under Section 10(b), and common law fraud. *See, e.g., Diduck v.*

*Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 277–78 (2d Cir.1992) (citing *Beck* test—promulgated in connection with mail and wire fraud claims—as one possible method for evaluating common law fraud pleading); *Beck v. Manufac-*

ing no desire to gain control of Spartech is belied by the Original Agreements themselves, which contained express limitations on Defendants' behavior—for only a three-year period—to prevent them from achieving such control over Plaintiff's objections.

### V.

Defendants' motion for the imposition of sanctions on Plaintiff, pursuant to Rule 11 of the Federal Rules of Civil Procedure, is denied. Defendants move this Court to impose sanctions on Plaintiff for filing a frivolous Complaint. If a court determines that a pleading, motion, or other paper is not well-grounded in fact, the court "shall impose upon the person who signed it, a represented party, or both, an appropriate sanction...." Fed.R.Civ.P. 11; *see also International Shipping Co., S.A. v. Hydra Offshore, Inc.,* 875 F.2d 388, 390 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985). Defendants' motion rests on the claim that Plaintiff's Complaint was frivolous. Because this Court declines to so find, the imposition of Rule 11 sanctions is, therefore, inappropriate.

### VI.

For the reasons set forth above, Defendants' motion to dismiss both Counts of Plaintiff's Complaint is granted, and Plaintiff's Complaint is dismissed without leave to replead. Plaintiff has alleged the facts which he claims entitle him to relief in such great detail that amendment would be futile. Defendants' motion for Rule 11 sanctions is denied.

SO ORDERED.

turers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987) (citing, as a test for adequacy of mail and wire fraud pleading, the requirements for adequacy of fraudulent intent pleading in Section 10(b) context as delineated in *Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled by, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc) (overruling *Beck* on issue of what con-stitutes "pattern" for purposes of RICO statute); *Dymm v. Cahill,* 730 F.Supp. 1245, 1257 (S.D.N.Y.1990) (applying same pleading requirements to common law fraud claim and Section 10(b) fraud claim). Thus, this Court's finding that Plaintiff failed to adequately plead fraudulent intent with regard to his mail and wire fraud claims is likewise dispositive of his common law fraud claim.