Lawrence M. POWERS,
Plaintiff–Appellant,

v.

BRITISH VITA, P.L.C., Rodney H. Sellers, and Francis J. Eaton, Defendants–Appellees.

No. 412, Docket 94–7230.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1994.

Decided June 8, 1995.

**180**

Henry P. Wasserstein, Skadden, Arps, Slate, Meagher & Flom, New York City (Robert L. Meyers and Mark A. Berman, of counsel), for plaintiff-appellant.

Susanne M. Toes, Milbank, Tweed, Hadley & McCloy, New York City (Russell E. Brooks, Alisa Odeen, of counsel), for defendant-appellee.

Before NEWMAN, Chief Judge, and WALKER and CALABRESI, Circuit Judges.

WALKER, Circuit Judge:

This action is brought by Lawrence Powers, the former Chief Executive Officer and Chairman of the Board of Spartech Corporation ("Spartech"), against British Vita ("BV"), an investor in Spartech, and two of BV's officers and directors. Powers alleges common law fraud and a violation of civil RICO arising from BV's purchase of shares of Spartech and its assumption of effective control of the company. Powers appeals from an order of the United States District Court for the Southern District of New York (Lawrence M. McKenna, *Judge*) granting defendants' motion to dismiss plaintiff's claims for failure to state a claim upon which relief can be granted. Powers contends that the district court erred on several grounds, including its holdings that the complaint did not sufficiently allege fraudulent intent and that Powers lacked standing to raise predicate acts of securities fraud.

For the reasons stated below, we affirm the district court's judgment in part and reverse in part.

### BACKGROUND

■ For the purposes of this appeal from the dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), we accept the allegations of fact in the complaint as true. *See Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

In 1988, Spartech Corporation, acting through its CEO and Chairman Lawrence Powers, began to search for a purchaser for its lucrative "rigid plastic sheet" group in order to pay off debt and distribute capital to its shareholders. Instead of finding a company willing to purchase one distinct part of Spartech, Powers found an investor, BV, interested in acquiring a substantial portion of the entire company's stock. Wary of a clandestine takeover, Powers and Spartech agreed in 1989 to sell securities to BV in

1989, but only upon assurances that Spartech's current management would not be removed and that the existing shareholders could veto any bid by BV for control. Less than three years later, Powers had been deposed as head of Spartech and had seen his share in the corporation severely reduced while BV's share and influence grew. Claiming that BV had fraudulently broken its promises in seizing control of Spartech, Powers initiated this action.

Spartech is a publicly held New Jersey corporation that specializes in the processing of plastics. When Spartech first went public in 1968, Powers, a substantial shareholder, served as counsel and member of the board of directors. He subsequently rose to Chairman of the Board in 1977 and Chief Executive Officer in 1983. Under Powers's stewardship, the business grew rapidly and expanded into several new areas, including rigid plastic sheet products that were manufactured in six plants.

In 1985, Powers called on a longtime friend and investment banker, Thomas Cassidy, for help in restructuring Spartech's finances. Cassidy, on behalf of an investor group known as Trust Company of the West ("TCW"), purchased a large amount of common stock, convertible preferred stock, warrants, and a subordinated note from Spartech. As a condition of the investment, Powers and TCW entered into a written agreement that Powers would designate four and TCW two of Spartech's directors and that Powers and TCW would each hold veto power over new financing transactions, sales of securities, and acquisitions. Powers was thereby guaranteed control over the company while TCW was able to protect its investment. After a further investment by TCW, Powers held 22 percent of Spartech's common stock and TCW held 27 percent.

In late 1988, TCW and certain other shareholders made it known that they wished to liquidate part of their interest in Spartech. Seeking to raise the necessary capital for this purchase and at the same time to retire some of its bank debt, Spartech distributed a brochure that offered to sell its rigid plastic sheet group for $80 to 100 million. At that point, neither Powers nor Spartech's board intended to sell the entire business.

Spartech's offering brochure caught BV's attention. BV, a publicly held British corporation, had the largest rigid plastic sheet group in Europe and a substantial capital base. It viewed Spartech as an undervalued company with several plastics businesses complementary to its own and thus wanted to acquire the entire company at a bargain price.

BV first approached Spartech in late 1988 with two bids for the company. Its first offer was to buy fifty percent of Spartech's equity, valued by the market at $32 million, for $19 million. Its second offer boosted the asking price to a range of $25 to 30 million. While keeping open the possibility of a sale of a large block of Spartech equity, Powers rejected the bids as inadequate. Powers explained to BV that he was unwilling to allow BV to gain control of Spartech for a small investment and then use that control position to squeeze him out of the company. For the better part of a year, BV continued to court Powers. BV promised to help build Spartech into a company with half a billion dollars in annual revenues. BV gave assurances that Powers and TCW could each maintain veto power over any further BV investments and that Powers could expect to stay in control of Spartech for at least six years and could remain active in the company until his retirement. With these assurances and encouraged by the prospects for success, Powers succumbed.

In September of 1989, BV, Spartech, and Spartech's principal investors entered into a series of agreements to effectuate BV's purchase of 29 percent of Spartech's stock—eventually convertible into 34 percent—for $23.6 million. First, BV, Powers, and TCW entered into a new voting agreement ("Voting Agreement") with a ten-year term. The agreement expanded Spartech's board from six to eight members, four to be designated by Powers and two each by TCW and BV. It also gave each of the three principal investors veto power over any further sale, merger, takeover, or stock issuance and permitted Powers to find competing offers if BV attempted a large stock purchase or change of

control. The Voting Agreement also provided that any party could terminate it if the value of Powers's holdings in the company fell below $2.5 million.

Second, Spartech and BV entered into an investment agreement ("Investment Agreement"). Under this agreement, BV promised to forego (1) the purchase of additional Spartech securities contrary to Powers's veto rights under the Voting Agreement, (2) conversion of its preferred stock if such conversion would result in BV's holding more than 40 percent of the outstanding common stock, and (3) any attempt at a takeover of Spartech over Powers's objection.

The third agreement was a "Memorandum of Understanding" between BV and Spartech ("Memorandum"). Under the Memorandum, Spartech would continue to operate under its current management and independently from BV, all transactions between Spartech and BV would be negotiated "on a fair and reasonable arms-length basis," and the parties would deal with each other at all times "in an evenhanded, fair and reasonable manner, with the objective of maximizing Spartech's shareholder value."

According to plaintiff's complaint, BV never intended to live up to its promises. To the contrary, by the time BV signed the Voting Agreement, the Investment Agreement, and the Memorandum, BV had allegedly developed an elaborate plot to oust Powers, dismantle the protections contained in the three documents, and use its influence to acquire a controlling block of Spartech stock at a substantially lower price than it would have had to pay if it had bargained at arms length.

The ink was hardly dry on the three agreements before BV began to undermine Powers's authority in order to gain control of Spartech. Powers alleges that BV's chairman began to avoid Powers, Powers's picture was left out of BV's newsletter that covered its management conference and BV's annual report, and Defendants Sellers and Eaton, board members designated by BV, openly criticized Powers at board meetings and to Spartech management, including Powers's own subordinates.

According to the complaint, BV soon gained a willing confederate on Spartech's board, Bradley Buechler. Upon becoming Spartech's CEO, Powers made Buechler his principal assistant. In 1985, he put Buechler on the board of directors and in 1987 appointed him president and chief operating officer. In 1989, when negotiations began between Spartech and BV, Powers included Buechler in the process and encouraged him to meet separately with BV to discuss future plans. However, Buechler's ambitions to replace his benefactor led him to conspire clandestinely with BV to plot Powers's removal. Buechler joined the chorus of BV's board designees in criticizing Powers to the board and delayed equipment upgrades at the division of Spartech where Powers was most active. Then, in December of 1990, Sellers suggested that Buechler replace Powers in managing the largest of Spartech's divisions.

In the face of this hostility, Powers proposed that Spartech and BV separate pursuant to a clause in the Memorandum of Understanding and that Spartech sell its rigid plastic sheet group to BV for $33 million. BV tentatively agreed to Powers's proposal, and Spartech and TCW thereafter informally approved the measure. In March, 1991, after Spartech and TCW had undertaken substantial steps to arrange the transaction, however, BV backed out of the deal. According to Powers, BV simply feigned interest and withdrew in bad faith in order to undermine his credibility further and heighten Spartech's need for cash.

BV's efforts to oust Powers came to fruition in September of 1991. Because of the recession and losses attributable to one of Spartech's divisions, through no fault of BV, the market price of Spartech stock fell below $1 per share late in the summer of 1991. In September, 1991, TCW's Thomas Cassidy, allegedly at BV's request, asked Powers to resign as Chief Executive Officer. Powers agreed to step down and accept a consulting arrangement offered by Cassidy.

Two days later, BV informed Powers that, because his 2.1 million shares were now worth less than $2.5 million in the market, it intended to terminate the Voting Agreement pursuant to the termination clause and

threatened litigation if Powers did not consent. According to Powers, BV did this knowing that the intent of the parties in drafting the termination clause was to measure stock value, not by the market value of the thinly traded stock, but by the fair market value of the entire block, an amount which exceeded the threshold of $2.5 million. To put further pressure on Powers, defendants postponed the annual shareholders meeting at which Powers would likely have been elected to serve as a director for an additional three-year term. Buechler also threatened to withhold Powers's agreed-upon severance pay and to force Powers to sue for it unless plaintiff relinquished his rights under the Voting Agreement.

Under this pressure, Powers agreed to terminate the Voting Agreement at a directors' meeting on September 27, 1991. In the resulting settlement and termination agreements executed by BV, TCW, and Powers, the parties formally terminated the Voting Agreement and agreed that Powers would resign as CEO and Chairman of the Board and begin the consulting arrangement proposed by Buechler. The agreements also extended the time for payment of Powers's severance pay in contravention of his 1989 employment agreement. Although the agreements allowed Powers to remain on the board of directors, they abrogated his rights to veto additional stock purchases or takeover bids and to designate directors.

With Powers's role confined to that of director and consultant, BV and TCW jointly assumed control of Spartech. Although one of Powers's two designees remained on the board, the other was replaced by a TCW designee in October of 1991, leaving Powers and his remaining designee with two seats, TCW with three seats, BV with two seats, and Buechler under BV's control in the remaining seat. Because TCW wished to sell its interest and BV was the only practical purchaser, TCW deferred to BV on nearly all matters. BV thus enjoyed effective control over Spartech and therefore achieved, according to Powers, the clandestine goal it harbored from the beginning.

Once in control, BV and TCW conceived and carried out a "Recapitalization Plan" ("The Plan"). Because of writeoffs in 1991, Spartech's book value had fallen to $5 million. In order to convert subordinated debt into book equity and reduce interest charges, the Recapitalization Plan called for the issuance of 3,540,000 shares of common stock and four new series of preferred stock convertible into over 15 million common shares. Even though Powers was still a director and had been at the forefront of all existing Spartech financing arrangements since 1977, the board did not inform him of the Plan, much less include him in its preparation. He did not learn of its existence until December, 1991.

The Recapitalization Plan also served to increase the equity holdings of BV and TCW at little cost. In June, 1992, BV exchanged $7.8 million of non-dividend preferred securities and $1.5 million cash for different Spartech preferred securities worth approximately $28 million and convertible into 8.75 million shares of common stock. TCW received preferred stock convertible into 8 million shares of common stock. As a result, BV's post-conversion holdings would be 33.5 percent of Spartech and TCW's 31 percent, giving the two nearly a 65 percent stake in the company.

Other shareholders, including Powers, did not fare so well under the Plan. Powers's personal position in Spartech, once 22 percent, declined to eight percent (including options convertible to common stock). Further, because his stock options will likely never be exercised due to the drop in market price, plaintiff's actual stake has effectively declined to three percent. The position of all minority shareholders was effectively reduced from 31 percent to 18 percent. The Plan, by increasing shares from 3.8 million to about 22 million, correspondingly diluted earnings per share nearly six-fold without increasing the number of shares held by most shareholders.

In May, 1993, Powers filed his complaint in this action. He claimed that BV's scheme amounted to common law fraud and a violation of RICO § 1962(b) and demanded $45 million in damages. Defendants moved for dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(6). On Febru-

ary 15, 1994, the district court dismissed plaintiff's complaint in full without leave to replead. *Powers v. British Vita, P.L.C.*, 842 F.Supp. 1573, 1585 (S.D.N.Y.1994). This appeal followed.

## DISCUSSION

■ In order to state a civil RICO claim, Powers must initially allege two or more acts of "racketeering activity." 18 U.S.C. §§ 1961(5), 1962(b). The complaint lists many predicate acts, including securities fraud as defined in 18 U.S.C. § 1961(1)(D), mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343.

The district court found plaintiff's complaint deficient in several respects. First, the court concluded that Powers failed to allege fraudulent intent as part of the predicate acts of wire and mail fraud. Second, the court held that Powers lacked standing to assert securities fraud as predicate acts with respect to BV's original purchase of Spartech stock since Powers was not a "purchaser or seller" of securities. Although the district court found that Powers did have standing to allege fraud based upon his own purchase of Spartech options, it concluded that the complaint did not sufficiently allege a scheme to defraud Powers or a duty on the part of BV to disclose the Recapitalization Plan. The court also dismissed Powers's common law fraud claim as similarly lacking both fraudulent intent and a duty to disclose the Plan. Powers contests all of these holdings, and we address them in turn.

## I. Fraudulent Intent

■ To allege predicate acts of wire and mail fraud, the complaint must state that defendants used the mails or wire transmissions in furtherance of a scheme to defraud. 18 U.S.C. §§ 1341, 1343. Although it is not necessary to prove that anyone was actually defrauded, *see United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987), Powers must adequately allege intent to defraud. *See id.; Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled in part on other grounds*,

*United States v. Indelicato*, 865 F.2d 1370, 1383–84 (2d Cir.1989) (en banc). Because "it would be unrealistic to expect a plaintiff to plead a defendant's actual state of mind," *Drexel Burnham Lambert Group, Inc. v. Microgenesys, Inc.*, 775 F.Supp. 660, 664 (S.D.N.Y.1991), Federal Rule of Civil Procedure 9(b) permits plaintiffs to allege fraudulent intent generally while the circumstances amounting to fraud must be averred "with particularity." Still, the plaintiff must "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference" of fraudulent intent. *Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F.Supp. 926, 935 (S.D.N.Y.1989) (citing *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987)).

■ A complaint may give rise to a sufficient inference of fraudulent intent in two ways. First, the plaintiff may allege a motive for committing fraud and a clear opportunity for doing so. *See Beck*, 820 F.2d at 50; *Polycast*, 728 F.Supp. at 935. Second,

> [w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.

*Beck*, 820 F.2d at 50 (citations omitted). Here, the district court concluded that plaintiff failed at both methods. It held that Powers had not alleged facts showing a clear opportunity to commit fraud. *Powers*, 842 F.Supp. at 1580–81. It then concluded that Powers failed to allege sufficiently that BV had either gained control of Spartech or abrogated its contractual obligations, and in the absence of such clear misdeeds "conscious behavior" was lacking. *Id.* at 1581–82. While we agree with the district court that Powers failed to allege clear opportunity, we think that it is possible to infer fraudulent intent under the "conscious behavior" approach.

### A. Motive and Clear Opportunity

In concluding that Powers had failed to allege a clear opportunity to commit fraud, the district court noted that BV faced a

number of barriers to taking control of Spartech. *Powers,* 842 F.Supp. at 1581. Most importantly, Powers was in firm control of Spartech when BV entered the scene. He served as Chairman of the Board and CEO and, by virtue of the voting agreement with TCW, had the power to designate four out of five of Spartech's directors. Furthermore, Powers and the other substantial shareholder, TCW, were de facto allies, which seemed to preclude a takeover bid. In seeking to refute this conclusion, Powers argues that BV's unique opportunity to purchase TCW's shares and its discovery of Buechler as a co-conspirator provided the clear opportunity to seize control of the corporation. Even if these contentions are accepted as true, however, a number of circumstances had to arise and a number of players outside of BV had to cooperate in order for BV's alleged scheme to have come to fruition.

■ When courts speak of "clear opportunity" to commit fraud, they do not envision the kind of elaborate plot that is alleged to have unfolded in this case. Instead, the usual finding of clear opportunity arises when the defendant is already well positioned to carry out the fraudulent transaction, such as when he possesses the necessary trust and authority. *See Turkish v. Kasenetz,* 27 F.3d 23, 28 (2d Cir.1994) (holding that, as fiduciaries of the plaintiff trust, defendants had a clear opportunity to commit fraud); *Jaquith v. Newhard,* 1993 WL 127212 at *7 (S.D.N.Y. Apr. 20, 1993) (defendant's position as president of a company gave him a clear opportunity to misrepresent its value in order to induce plaintiff's loan). In the takeover context, courts have found clear opportunity where the defendant already exercised substantial influence over plaintiff's decision-making. *See, e.g., In re Argo Communications Corp.,* 134 B.R. 776, 792 (Bankr. S.D.N.Y.1991) (defendant's control over two of seven members of plaintiff's board and ability to influence plaintiff's business decisions gave it a clear opportunity to commit fraud). Given the barriers BV faced at the outset of its dealings with Powers and Spartech, we think that BV's opportunity to commit fraud was far from "clear." We therefore agree with the district court that Powers failed sufficiently to allege facts from which

an inference of fraudulent intent could be drawn based upon a clear opportunity to commit fraud.

### B. *Conscious Behavior*

■ We next turn to the question whether Powers's complaint raised an inference of intent to defraud based on facts demonstrating "conscious behavior" evincing such intent. Although Powers's complaint details a complex scheme to oust him and gain control of Spartech, the district court concluded that plaintiff had failed to identify circumstances reflecting conscious behavior on the part of BV. The court based its conclusion on two findings. First, it noted that BV's current share in Spartech is no greater than the share contemplated in the various agreements between the parties, and that therefore there was little evidence that BV had accomplished its secret goal of gaining control of the company. *Powers,* 842 F.Supp. at 1581. Second, it decided that Powers had not supported his claim that defendants abrogated any of their contractual obligations. *Id.* We disagree with the district court and hold that the complaint does contain sufficient allegations of conscious behavior to raise an inference of fraudulent intent.

■ While "[t]he mere non-performance of promises is insufficient to create an inference of fraudulent intent," *Enzo Biochem, Inc. v. Johnson & Johnson,* No. 87 Civ. 6125, 1992 WL 309613 at *11–12 (S.D.N.Y. Oct. 15, 1992); *see also Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993), intent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident. Here, Powers alleges that BV took measures to effectuate his removal and gain control of Spartech soon after the ink was dry on the agreements manifesting its benign intentions. We find these allegations of conscious behavior, which go beyond mere non-performance, sufficient to support an inference of intent to defraud. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 81–82 (2d Cir. 1990).

District courts in this circuit have reached consistent conclusions on similar facts. In *Heineman v. S & S Machinery Corp.*, 750 F.Supp. 1179 (E.D.N.Y.1990), for example, the defendant promised to keep the plaintiff as president of a company, to respect the company's independence, and to provide substantial equity in exchange for an eighty percent share of the company. *Id.* at 1182. The court held that the defendant's efforts to undermine the plaintiff and exploit the company evinced intentional fraud. *Id.* at 1187; *see also Enzo*, 1992 WL 309613 at *12 (finding that defendant's repeated failure to cooperate with plaintiff as promised constituted conscious behavior); *In re AnnTaylor Stores Sec. Litig.*, 807 F.Supp. 990, 1006–07 (S.D.N.Y.1992) (finding that defendant's statement contradicting its earlier press release about expected earnings raised an inference of intent).

We are not persuaded otherwise by the district court's findings that the complaint fails to allege that BV either achieved its alleged goal of obtaining control of Spartech or broke its promises. First, we cannot conclude that either fact is determinative of intent in light of the entire pattern of conscious behavior alleged. Moreover, we think that at this stage of the litigation the district court's conclusions on these points were premature.

■ In concluding that Powers failed adequately to allege that BV gained control of Spartech, the district court fastened on the fact that BV's holdings after its alleged machinations—33.5 percent of shares—did not exceed the share anticipated in the original agreements. *Powers*, 842 F.Supp. at 1581. However, Powers also alleges that BV's fraudulent conduct substantially diluted his share of the company as well as that of other minority shareholders. The complaint also asserts that BV joined forces with TCW to command six of eight votes of the board of directors. Given these shifts in effective control, we do not see how it is possible to conclude, as a matter of law, that BV did not achieve its allegedly surreptitious goal.

With regard to the issue of whether Powers alleges violations of the various agreements, the district court held that, because Powers agreed to terminate the Voting Agreement, he has not shown that defendants violated it. *Powers*, 842 F.Supp. at 1582. Once the Voting Agreement was terminated, the court found that the Investment Agreement was no longer a barrier to further investment by BV and that BV's later transactions were therefore permissible. *Id.* As to the Memorandum of Understanding, the district court concluded that Powers, as a non-signatory, cannot claim rights under the agreement; in addition, the district court noted that it was unable to conclude from the complaint that BV violated its promise to maximize shareholder value. *Id.*

■ Because we find the Memorandum of Understanding determinative, we address it first. The Memorandum contains assurances from BV and Spartech that they will deal with each other in an "even-handed, fair and reasonable manner," that BV will respect Spartech's independence, and that current management will remain with Spartech. Given the "great generosity" with which we are required to read a complaint upon a motion to dismiss, *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 558 (2d Cir.1985), we cannot conclude that the entire course of conduct attributed to BV did not violate the assurances in the Memorandum. Powers alleges a series of underhanded acts taken in bad faith toward Spartech, including disparagement of its CEO to his subordinates, interference with projects and directives, and the formulation of a Recapitalization Plan that deprived the corporation of fair value and diluted the holdings of minority shareholders. If shown to be true, this conduct would transgress BV's promises of fairness and good faith. In these circumstances, we cannot say that defendants did not violate the Memorandum.[1]

1. The district court is correct in noting that Powers is not a signatory to the Memorandum. This fact may bear on the issue of standing, a complex issue that the district court did not address in this context. Cf. *Ostano Commerzanstalt v. Tele-wide Sys., Inc.*, 794 F.2d 763, 765–66 (2d Cir. 1986) ("[A] fraudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the per-

In light of the foregoing facts indicating conscious behavior, it is immaterial whether defendants violated the Voting Agreement or the Investment Agreement. Plaintiff contends that he only agreed to terminate the Voting Agreement under duress, a contention the district court rejected. While we think, as we address below, that the issue of duress may bear on the element of causation, we do not consider it essential to a finding of conscious behavior. Defendants' threat to withhold Powers's severance pay and their efforts to delay his reelection as director may themselves violate the Memorandum of Understanding without rising to the level of duress. Similarly, the district court's finding that defendants violated the Investment Agreement may be relevant to the issue of causation, but it does not preclude a finding of conscious behavior. We believe that Powers's complaint details enough conduct that is inconsistent with the Memorandum to permit a trier of fact to infer intent to defraud.

II. Securities Fraud Predicate Acts

 The district court dismissed Powers's securities fraud predicate acts on two grounds. First, the district court held that Powers lacked standing to object to BV's initial purchase of Spartech securities because he was not a "purchaser or seller of securities" as required by Section 10(b) of the Securities and Exchange Act of 1934. This standing requirement does not eliminate Powers's challenge regarding his own purchase of securities pursuant to the Employment Agreement or his termination, however. As to those predicate acts, the district court was unable to infer a fraudulent scheme because it did not find that BV had a duty to disclose the pending Recapitalization Plan. We agree with the district court that Powers does not have standing with respect to BV's purchase, but reverse as to Powers's own purchase of Spartech securities.

A. *Standing*

Powers alleges securities fraud with respect to three transactions: BV's initial purchase of securities from Spartech; Powers's purchase of options on one million shares of Spartech stock pursuant to the 1989 Employment Agreement; and finally, Powers's purchase of additional options in November, 1991 pursuant to the settlement agreement.

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), held that only purchasers and sellers of securities have standing to assert a claim of securities fraud under Section 10(b). *Id.* at 749–55, 95 S.Ct. at 1931–35. It is clear that Powers, as the purchaser of securities, has standing under Section 10(b) to allege fraud with respect to the second and third of these transactions. *See Polar Molecular Corp.,* 12 F.3d at 1175 ("Employment contracts promising shares as compensation are generally considered securities transactions within Rule 10b–5."); *Yoder,* 751 F.2d at 558–61 (holding that stock offered as an inducement to accept employment qualifies as a purchase or sale of securities under the Securities Exchange Act). With respect to the first transaction, however, the district court held that because Spartech sold securities to BV, Powers did not have standing to raise a claim of securities fraud under Section 10(b) and therefore could not allege such fraud as a predicate act under RICO. *Powers,* 842 F.Supp. at 1583.

There is currently a question that the Supreme Court has left unresolved as to the last step in the district court's reasoning. Justice O'Connor's concurrence in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring), concludes that Section 10(b)'s "purchaser or seller" standing requirement should not be applied to RICO claims. She reasons that, unlike with Rule 10b–5, Congress specifically provided for a private right of action in the RICO statute for any person whose business or property is injured by reason of a violation that would amount to one of the specified crimes. *Id.* at 287, 112 S.Ct. at 1327. These crimes may be proven without regard to

son making the misrepresentation to liability to the third party."). We need not do so in light of our holding in this opinion that Powers does not sufficiently allege proximate cause with respect

to defendants' violation of the Memorandum. We do not believe, however, that Powers' nonsignatory status necessarily precludes a finding of conscious behavior.

victim standing. Because the language in RICO spells out its own standing requirement and does not mention a "purchaser or seller" requirement, Justice O'Connor does not believe that Rule 10b–5's prudential limit should necessarily be imported into the RICO context. *Id.*

Three other justices have explicitly supported Justice O'Connor's position. *See id.* at 275, 112 S.Ct. at 1322 (White, J. and Stevens, J., joining in concurrence); *id.* at 285–87, 112 S.Ct. at 1327 (Scalia, J.). Several district courts in this circuit, as well as several other circuit courts, have also adopted Justice O'Connor's view. *See, e.g., Securities Investor Protection Corp. v. Vigman,* 908 F.2d 1461, 1466–67 (9th Cir.1990), *cert. granted in part,* 499 U.S. 974, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991), *rev'd on other grounds,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *In re Colonial Ltd. Partnership Litig.,* 854 F.Supp. 64, 105–06 (D.Conn.1994); *In re Crazy Eddie Sec. Litig.,* 812 F.Supp. 338, 352–53 (E.D.N.Y.1993). Because the remainder of the Supreme Court disposed of *Holmes* on another ground, however, the question whether Section 10(b)'s standing requirement applies to RICO predicate acts is still an open one. *Holmes,* 503 U.S. at 275, 112 S.Ct. at 1321–22.

We find it unnecessary to reach this significant issue in this case. Courts that have held that Section 10(b)'s "purchaser or seller" requirement does not apply to RICO predicate acts of securities fraud have phrased the standing requirement for RICO in terms of causation: because RICO's explicit standing requirement is that a person be injured "by reason of" a violation of the securities laws, 18 U.S.C. § 1964(c), the plaintiff must show that a violation caused the injury at issue. *See In re Crazy Eddie,* 812 F.Supp. at 355; *cf. Securities Investor Protection Corp.,* 908 F.2d at 1466. This test for standing for securities fraud predicate acts is consistent with this court's holding that causation is an essential component of the RICO standing requirement. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767, 769 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995); *Standardbred Owners*

*Ass'n v. Roosevelt Raceway Assocs., L.P.,* 985 F.2d 102, 104 (2d Cir.1993); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990).

Powers lacks standing to assert a predicate act of securities fraud with respect to BV's initial purchase of Spartech securities under either the "purchaser or seller" or the causation formulation. First of all, it is clear that Powers neither bought nor sold the securities in question. Second, as explained below, Powers does not sufficiently allege that defendants' fraudulent conduct proximately caused his loss. *See Securities Investor Protection Corp.,* 908 F.2d at 1468 (To state a RICO claim, plaintiff "must establish a causal connection between the alleged predicate acts of securities fraud and the losses they seek to recover."). Because standing is lacking as to this predicate act under either theory, we need not determine the precise contours of the standing requirement. *Cf. Holmes,* 503 U.S. at 275, 112 S.Ct. at 1321–22 (declining to decide whether the purchaser or seller requirement applies in all RICO cases since conflicting cases could be resolved on proximate cause grounds).

## B. *Duty to Disclose the Recapitalization Plan*

The district court held that, although Powers has standing to assert securities fraud with respect to his own purchase of Spartech options pursuant to the settlement agreement, he did not sufficiently allege a fraudulent scheme or a duty on the part of defendants to disclose the Recapitalization Plan. *Powers,* 842 F.Supp. at 1583–84. We believe that the district court was too quick to reach both conclusions as a matter of law.

Consistent with our earlier conclusion that sufficient conscious behavior was alleged to support an inference of fraudulent intent as to the predicate acts of wire and mail fraud, we believe there is support for a finding of intent for the securities fraud predicate acts related to Powers's purchases. According to the complaint, defendants offered Powers Spartech options as part of his termination package in order to induce him to rescind the Voting Agreement and resign as head of the

company. Defendants' intention was to dilute both Powers's options and his actual holdings in the company through the Recapitalization Plan. Defendants' decision not to disclose the Plan to Powers despite his clear interest and his position as a director is sufficient conscious behavior to give rise to an inference of fraudulent intent.

 We also do not believe that it is possible to conclude, as a matter of law, that defendants had no duty to disclose the Recapitalization Plan. A fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information; unique access to information can also trigger such a duty. *See Enzo Biochem,* 1992 WL 309613 at *15; *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 738–39 (2d Cir.1984). By the time the termination and settlement agreements were signed, defendants were directors and, arguably, controlling shareholders of Spartech. They therefore owed a fiduciary duty to Powers, a fellow director and minority shareholder. *See Alpert v. 28 Williams St. Corp.,* 63 N.Y.2d 557, 483 N.Y.S.2d 667, 673–74, 473 N.E.2d 19, 25–26 (1984). Given the effect of the Recapitalization Plan on Powers's options and other shareholders' shares, we cannot conclude that defendants had no duty to disclose the Plan during negotiations over Powers's termination.

## III. Causation

With the exception of this last securities fraud allegation, however, Powers's fraud claims suffer from another flaw. While Powers has standing under Section 12(b) to raise securities fraud predicates, he has not alleged the proximate causation necessary to have standing for his RICO claim for many of the securities fraud and mail and wire fraud predicates. As a result, the district court correctly found these predicate acts insufficient.

 As explained above, a plaintiff must show that the defendant's violations of the RICO statute caused his injuries in order to have standing for a RICO claim. "This requires a showing not only that the defendant's alleged RICO violation was the 'but-for' cause or the cause-in-fact of his injury,

but also that the violation was the legal or proximate cause." *First Nationwide,* 27 F.3d at 769 (citing *Holmes,* 503 U.S. at 264–268, 112 S.Ct. at 1316–18). "In the context of predicate acts grounded in fraud, the proximate cause requirement means that the plaintiff must prove both transaction and loss causation." *Id.* In other words, a plaintiff alleging securities fraud predicate acts must show not only that defendant's fraudulent acts caused him to enter into a securities transaction, but also that the defendant's fraudulent conduct caused the plaintiff's eventual loss. "Furthermore, when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." *Id.*

 In this case, at least two factors acted as intervening direct causes of Powers's injury. First, the market value of Spartech stock fell dramatically, caused, as Powers admits in his complaint, by "the recession and the Favorite Plastic losses" rather than by any fraudulent conduct of the defendants. Second, Powers's holdings in Spartech then fell below $2.5 million, allowing BV to trigger the termination clause in the Voting Agreement.

Powers counters by insisting that BV's efforts to trigger the termination clause were based on a bad-faith misinterpretation of the Voting Agreement since the parties had agreed that the value of Powers's shares were to be determined by fair market value rather than stock market value. The presence of a second direct intervening cause, however, fatally undermines Powers's position. Powers himself agreed to rescind the Voting Agreement and thus gave up his right to veto further BV purchases of Spartech stock, to seek competitive bidders, and to designate Spartech directors. It was Powers's voluntary rescission of these protections together with his resignation as Chairman and CEO that allowed BV to gain control of Spartech.

 Powers therefore fails sufficiently to allege loss causation with respect to BV's conduct in gaining control of Spartech. Pow-

ers may be correct in contending that, if not for defendants' allegedly fraudulent assurances, he never would have allowed BV to purchase Spartech securities. This "but for" relationship is relevant to "transaction causation." Even according to the complaint's version of the events, however, Powers lost effective control of the company independently of any fraudulent conduct by defendants. Powers had negotiated for and obtained a number of protections against further encroachment by BV; once he gave up those protections, even the best-intentioned investor would have been free to follow the course taken by BV and gain control of Spartech. Without the causal connection between the fraudulent statements and his loss, Powers does not have standing to raise the predicate acts of either securities or wire and mail fraud with respect to BV's purchase of securities. *See Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495–96 (2d Cir.1992).

Powers seeks to minimize the significance of his own actions in bringing about his downfall by contending that he only agreed to terminate the Voting Agreement under duress. This strategy provides no solace in the causation context. Powers does not allege that defendants' coercive efforts were themselves fraudulent, or that they constitute a predicate act of extortion; he solely alleges fraud based substantially on defendants' earlier misrepresentations of their true intentions. Thus, even assuming defendants did coerce Powers into rescinding the Voting Agreement, the chain of causation from defendants' fraudulent conduct to Powers's loss has been severed. *Cf. Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1344–45 (2d Cir.1994) (noting that standing must be based on injury caused by specific predicate acts, not other overt acts in furtherance of a RICO conspiracy).

■ Powers does have standing to allege predicate acts relating to his purchase of Spartech securities pursuant to his Settlement Agreement. As explained above, Powers alleges that defendants were in the process of formulating the Recapitalization Plan when they negotiated his resignation in late September, 1991. Although the resulting termination package included additional Spartech options, defendants failed to disclose to Powers their plan to issue large amounts of stock to BV and TCW at substantially below market price. Powers claims that he would not have accepted these options had he known of the pending Plan. The complaint also alleges that the Recapitalization Plan diluted the value of Spartech shares and made these options unexercisable. These allegations support a finding of transaction and loss causation.

Our decision in this case affirms the dismissal of the bulk of the predicate acts alleged by Powers. From the few predicate acts that remain following our review, it is not clear whether Powers has established a pattern of racketeering activity necessary to state a RICO claim. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232–33, 238–43, 109 S.Ct. 2893, 2897–98, 2900–03, 106 L.Ed.2d 195 (1989). In addition, there is a serious question whether Powers's bare allegations that defendants formulated the Recapitalization Plan during the month of September, 1991 satisfy Federal Rule of Civil Procedure 9(b)'s requirement that the circumstances constituting fraud be pled with particularity. Because the district court did not have occasion to address these issues, "[w]e think it better for these matters to be addressed by the district court in the first instance." *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 30 F.3d 289, 293–94 (2d Cir.1994) (remanding to the district court to determine the similar issues since the district court initially dismissed plaintiff's RICO claim on standing grounds).

IV. Conclusion

Because plaintiff failed to allege that defendants' fraudulent conduct proximately caused his loss of control of Spartech, the district court correctly dismissed the RICO predicate acts relating to BV's purchase of Spartech securities. On the other hand, Powers has sufficiently alleged that defendants had a duty to disclose the Recapitalization Plan and that their failure to do so proximately caused the devaluation of his stock options. The judgment of the district court with respect to predicate acts relating to Powers's purchase of securities and their

subsequent dilution under the Recapitalization Plan and with respect to Powers's allegation of common law fraud involving the Recapitalization Plan is therefore reversed and remanded. In all other respects the judgment of the district court is affirmed.

JON O. NEWMAN, Chief Judge, dissenting:

Lawrence Powers, a sophisticated lawyer and businessman, serving as CEO, director, and shareholder of Spartech, a publicly traded company specializing in the processing of plastics, found his debt-ridden company in need of financial assistance. BV, a publicly held British corporation, offered to supply $23.6 million in needed capital for 29 percent of Spartech's stock. In 1989 Spartech and BV negotiated three agreements to protect their respective interests. Ultimately Powers concluded that it was in the best interests of Spartech for him to release BV from some of the commitments it had made when it came to Spartech's rescue. Released from these commitments, BV proceeded to increase its stake in Spartech, advancing more funds for an increased equity position. Powers now sues BV, claiming that it has breached the agreements it made when it first invested in Spartech and that the breach was planned from the outset, thereby constituting fraud. The District Court dismissed the suit, correctly analyzing it for what it is—a crybaby attempt by a businessman to achieve success in the courtroom that he could not achieve in the real world of corporate finance. Regrettably, the majority has kept a portion of the complaint alive, thereby giving Powers the opportunity to try to extract an undeserved settlement. From this unfortunate result, I respectfully dissent.

To keep Powers's suit in court, the majority takes several steps that are either factually or legally unsupportable. First, the majority characterizes Powers as having "succumbed" to BV's offer to put up $23.6 million in exchange for 29 percent of Spartech's stock. Yet nothing in Powers's detailed complaint remotely supports the implication that

BV did anything improper to coerce Powers's agreement. Powers did not "succumb"; he leaped at the opportunity.

Second, the majority cites as circumstances supporting a fraudulent intent to breach the investment agreements the fact that BV's chairman "began to avoid" Powers, that Powers's picture was omitted from a BV newsletter, and that board members of Spartech appointed by BV "openly criticized" Powers at Spartech board meetings. None of these allegations is the stuff of fraud; the first two tell us more about Powers's ego than about any plot by BV to breach agreements, and the third is precisely what directors are supposed to do at board meetings when they become dissatisfied with an officer's performance.

Third, the majority characterizes Powers's agreement to terminate the key Voting Agreement, the first of the three 1989 agreements, as the result of "pressure." The "pressure," it turns out from the face of Powers's complaint, is BV's statement that it would exercise its contractual right to terminate the Voting Agreement because the value of Powers's stock in Spartech had fallen below $2.5 million and that it would sue Powers if he did not abide by the termination provisions of the Agreement. Rather than press his view as to how his shares were to be valued for purposes of triggering the termination clause of the Agreement, Powers chose to terminate the Agreement, a step he presumably thought was in the best interests of Spartech, a company to which he owed a fiduciary obligation as a director. Powers also found it personally advantageous to agree to resign as president in order to protect his severance benefit.

Fourth, the majority points to the recapitalization plan that the directors of Spartech ultimately adopted, whereby BV increased its stake in Spartech, without mentioning that Powers, as a director with fiduciary obligations to Spartech, voted for the plan as being in the best interests of the company. *See Powers v. British Vita, P.L.C.,* 842 F.Supp. 1573, 1578 (S.D.N.Y.1994).[1]

---

1. Though Powers does not allege that he voted against the recapitalization plan, he does allege that he was excluded from negotiations concern- ing the plan, Complaint ¶ 91, and that he dissented from board resolutions refusing to recognize the rights of option holders, *id.* ¶ 86.

On the legal issues, the majority acknowledges that a fraud plaintiff must allege "with particularity" circumstances that give rise to a "strong inference" of fraud. *See Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The majority next notes that the sufficient inference of fraudulent intent may be alleged either by showing a motive for committing fraud and a clear opportunity for doing so, or by showing circumstances indicating "conscious behavior" by the defendant. *See id.* The majority then finds the complaint deficient under the motive and opportunity test, but sufficient under the "conscious behavior" approach. In doing so, the majority has taken the "conscious behavior" approach out of the limited context in which it was announced and pressed it into service in an entirely different context—one in which it can too readily permit most garden-variety state breach of contract actions to be routinely repackaged as federal fraud (and even RICO) lawsuits.

*Beck* permitted a fraud allegation to withstand a motion to dismiss where the plaintiffs alleged, with supporting documents, that the defendants had sold collateral at an artificially low price in order to defeat the security interest of creditors. We ruled that the allegations sufficed to permit the plaintiffs to prove that the defendants "consciously engaged in activities enabling [foreign third parties] to acquire the U.S. collateral at a fraudulently low price." *Id.* at 50. It made sense to recognize that the defendants' conduct was alleged to have been undertaken with the "conscious" purpose of defeating the creditors' security interests. But the recognition in that context of a "conscious behavior" approach to scienter cannot mean that scienter is adequately pleaded whenever a plaintiff alleges that a defendant is "conscious" of what it is doing. Every defendant alleged to have engaged in conduct claimed to breach a contract can be said to be "conscious" of its conduct. What the defendants in *Beck* were conscious of was not simply the fact that they had sold collateral, but the aggravated facts that they had fraudulently permitted the collateral to be sold at an artificially low price to defeat the security

interest of the creditors. *Beck* had nothing to do with a claim of an original intent not to perform a contract. To apply its "conscious behavior" rationale in the context of this case risks considerable mischief.

Though the majority agrees that the complaint does not sufficiently allege proximate cause with respect to defendants' alleged violation of the Memorandum of Understanding, *see* 57 F.3d at 186–87 n. 1, it nevertheless appears to include the allegations of breach of this agreement as part of the "conscious behavior" that enables the complaint to survive the motion to dismiss. However, the Memorandum of Understanding obligated BV and Spartech to deal with each other in an evenhanded, fair, and reasonable manner "with the objective of maximizing Spartech's shareholder value." The complaint provides no basis for inferring that BV did anything that failed to pursue the objective of increasing Spartech's shareholder value.

The majority acknowledges that "mere non-performance of promises is insufficient to create an inference of fraudulent intent," 57 F.3d at 185 (citations omitted), but then risks erosion of this long-standing principle by suggesting that "intent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident." *Id.* No authority is cited for this sweeping proposition. If it were so that breach soon after contract formation could support an inference of fraudulent intent not to perform, a very large number of breaches of contract could be readily pleaded as fraud causes of action, with the adverb "maliciously" routinely added. *See Kotick v. Desai,* 123 A.D.2d 744, 746, 507 N.Y.S.2d 217, 219 (2d Dep't 1986) ("The addition of an allegation of scienter will not transform a breach of contract action into one to recover damages for fraud."). Since the majority has not relied on any New York cases for its broad suggestion, I can only assume that it is not inviting all instances of early breach to be pled as fraud claims, but instead concludes that the allegations of the complaint in the particular case before us present especially aggravated circumstances that

raise, at least at the pleading stage, an inference of intent not to perform.

I disagree and find no support for even this limited conclusion in the majority's citation of *Ouaknine v. MacFarlane*, 897 F.2d 75, 81–82 (2d Cir.1990). *Ouaknine* is readily distinguishable. The allegations at the cited pages were that the defendants promised to pay one of the plaintiffs money out of the first proceeds of a sale, ample cash was available to make the payment out of the proceeds, and the defendants paid substantially less than was due. What made the allegations sufficient to support a claim of fraud was not that breach occurred soon after the agreement was made, but that the breach occurred under circumstances so completely unjustifiable, with abundant cash available to fulfill the agreement, that an inference arose that the defendants never intended to perform.

What should fundamentally require dismissal of Powers's complaint is the lack of any adequate pleading of the reliance element of fraud. Powers now contends that he was lulled into thinking that BV would not try to increase its stake in Spartech. The claim is refuted by the very nature of his allegations. These reveal that Powers, properly wary that any major investor might one day try to increase its stake in the company, negotiated detailed provisions concerning the circumstances under which such an increased position could be achieved. Powers cannot be heard to say that he relied on any assurance by BV that it would not seek to increase its equity position. He negotiated the conditions under which such an increase could be achieved. Then, when it became advantageous to his company in general and to himself in particular, he agreed to relax those conditions. He is not the victim of any fraud; he is merely a disappointed former officer of a company that needed to make its best deal with outside financiers in order to survive.

When a sophisticated businessman finds a business partner willing to put $23.6 million into a company in which he is shareholder, director, and CEO, and negotiates the deal he thinks provides him with adequate protection against a takeover, he cannot cry fraud when circumstances arise that make it advantageous for him and his company to abandon those protections and permit the takeover to occur, with his assenting vote as a director.

Judge McKenna acted forthrightfully in dismissing this complaint, in a particularly thoughtful opinion. I dissent from the partial reversal of his ruling.