Jeffrey ALNWICK, Marie Alnwick
and Big Blue Products, Inc.,
Plaintiffs,

v.

EUROPEAN MICRO HOLDINGS, INC.,
European Micro Plc., American Micro
Computer Center, Inc., John B. Galla-
gher and Harry D. Shields, Defen-
dants.

No. 99–CV–7380 (ADS)(ARL).

United States District Court,
E.D. New York.

Sept. 15, 2003.

Cohen Tauber Spievack & Wagner LLP, New York, NY (Jay B. Spievack, Stephen Wagner, Andrea J. Lawrence, Leo L. Esses, and Kayo Naruse, of Counsel), for Plaintiffs.

Phillips Nizer, LLP, New York, NY (Stuart A. Summit, and Michael Fischman, of Counsel), for Defendants.

SPATT, District Judge.

In this case, the plaintiffs Jeffrey Alnwick, Marie Alnwick (the "Alnwicks") and Big Blue Products, Inc. ("BBP") (collectively, the "plaintiffs") allege that the defendants European Micro Holdings, Inc. ("EM Holdings"), European Micro Plc. ("European Micro"), American Micro Computer Center ("AMCC"), John B. Gallagher ("Gallagher") and Harry B. Shields ("Shields") (collectively, the "defendants") engaged in a scheme to defraud the plaintiffs in a joint venture known as Big Blue Europe, B.V. ("BBE"). Presently before the Court are two motions, one by the defendants to dismiss the amended complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and on the basis of *forum non conveniens,* and another by the plaintiffs to file a second amended complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

The facts in this case are detailed in the Court's decision of March 22, 2001, *Alnwick v. European Micro Holdings, Inc.,* 137 F.Supp.2d 112, 114–118 (E.D.N.Y. 2001) and familiarity with that decision is presumed. Only the facts central to these motions are set forth here.

### A. The Parties

BBP is a New York corporation with its principal place of business in Huntington Station, New York. BBP is engaged in the business of buying and selling computer parts in the United States, with limited operation in Europe. The Alnwicks are residents of Huntington, New York and are principals in BBP.

EM Holdings is a Nevada corporation with its principal place of business in Miami, Florida. Through its subsidiaries, EM Holdings was engaged in the business of distributing "microcomputer option products" to customers primarily in Western Europe and was engaged in the business of buying and selling computer parts. Presently, EM Holdings has virtually no monies or assets and is no longer in operation.

European Micro is a British corporation with its principal place of business in Chesire, England. Through its subsidiaries, European Micro was engaged in the business of distributing microcomputer option products to customers primarily in Western Europe and was in the business of buying and selling computer parts. Presently, European Micro has virtually no monies or assets and is no longer in operation. AMCC is a Florida corporation with its principal place of business in Miami, Florida. Upon information and belief, presently, AMCC operates all of EM Holdings' computer parts business.

Gallagher is a resident of Ft. Lauderdale, Florida. Upon information and be-

lief, he has been a controlling principal of EM Holdings, European Micro and AMCC. Shields is a resident of Nashville, Tennessee. Upon information and belief, he has been a controlling principal of EM Holdings, European Micro and Square 1 International Ltd. ("Square 1").

## B. The Facts

The facts are taken from the amended complaint unless otherwise noted. In late November or early December 1996, the Alnwicks entered into an oral agreement with Shields and Gallagher to form a joint venture company to engage in the purchase and sale of computer parts in Europe. This oral agreement contained three parts: the European Joint Venture Agreement, the Shareholders' Capital Contribution Agreement and the Big Blue License Agreement.

In the European Joint Venture Agreement, the Alnwicks and BBP agreed with the EM Group to form BBE to purchase and sell computer parts in Europe. The EM Group consisted of European Micro, Technology Express, AMCC, Ameritech Argentina SA, Ameritech Exports, Inc., and any successors, assignees, affiliates, parents or subsidiaries or any companies owned, controlled or managed by Shields and Gallagher. In this agreement, the parties agreed to model the joint venture after BBP and to use their "best efforts" to assist BBE to meet its business and financial objectives. The amended complaint notes that the material terms of this agreement are contained in various writings. However, no writings are attached and neither party provides the Court with a copy of these alleged writings.

The European Joint Venture Agreement also contained an oral Non–Competition Agreement which was designed to preserve the demarcation between BBP (computer parts business in the United States), the defendants' computer options business in Europe, and BBE (computer parts business in Europe). The Non–Competition Agreement provided that, subject to certain unspecified limited exceptions, BBE could not solicit, buy or sell computer parts in the United States; BBE could not solicit, buy or sell computer options in Europe; Shields, Gallagher and the EM Group companies could not solicit, buy or sell computer parts in Europe or the United States; and neither the Alnwicks nor BBP could solicit, buy or sell computer parts in Europe.

The Shareholders' Capital Contribution Agreement appointed the Alnwicks, Shields and Gallagher the sole shareholders in BBE; issued 530,000 shares of BBE stock; allotted 132,500 shares of stock to each shareholder; appointed each shareholder to BBE's Board of Directors; required the Alnwicks to contribute $132,500 worth of computer parts products in exchange for 50% of BBE stock; and required Shields and Gallagher to contribute a combined contribution of $132,500 in cash in exchange for 50% ownership of BBE stock. The amended complaint notes that the material terms of the Shareholders' Capital Contribution Agreement are contained in a writing. However, no writings are attached and neither party provides the Court with a copy of this alleged writing. In the Big Blue License Agreement, the Alnwicks and BBP agreed to license the service mark "Big Blue" to BBE to be used in accordance with the terms of the European Joint Venture Agreement.

Shortly after the oral agreement to form a joint venture, the Alnwicks, Shields and Gallagher launched BBE. The Alnwicks allegedly accomplished their preliminary goals for BBE, including the creation of its infrastructure, the hiring and training of its sales force, the setting up of its headquarters, the crafting of its inventory man-

agement system, the implementing of its policies and procedures and the developing of its new and significant accounts. In developing BBE's infrastructure, the Alnwicks and BBP disclosed most of their trade secrets to BBE and the defendants, including, (i) customer contacts, lists and leads; (ii) supplier contacts, lists and leads; (iii) method of inventory acquisition; (iv) method of dismantling and testing computer equipment and computer parts inventory; (v) method of pricing computer parts inventory, inventory management and movement; and (vi) method of operating BBP's business.

In contrast to the Alnwicks' efforts, Shields and Gallagher allegedly attempted to weaken the joint venture through gross mismanagement of its affairs and encumbering it with unnecessary and exorbitant debt. Shields, Gallagher, European Micro and AMCC took steps to develop its "nascent" computer parts business in violation of the Non–Competition Agreement. In order to severely undermine BBE's chances of success, they along with other EM Group companies bought and sold computer parts in direct competition with BBP in the United States and BBE in Europe.

In May 1997, upon information and belief, Shields and Gallagher transferred their shares in BBE to European Micro without the Alnwicks' knowledge or consent. Upon information and belief, they did this to impress upon institutional and individual investors that the EM Group was committed to expanding its computer options business into the computer parts business. This was done with the hope to attract additional investors to their anticipated EM Group IPO. Because Shields and Gallagher required the Alnwicks' consent before transferring their shares, they "fraudulently represented" to them that the transfer to European Micro would assist in the success of BBE by providing it

with access to additional capital sources, potential financial resources to expand its business through the acquisition of competitors, greater visibility, and a significantly stronger position to market and obtain major European accounts for BBE.

The amended complaint further alleges that in spite of these representations, Shields and Gallagher intended to use the monies from the EM Group IPO for their computer options business and their own independent computer parts business which would have an adverse financial impact on the Alnwicks, BBP and BBE. Based on these representations, the Alnwicks consented to the transfer of the BBE shares to Shields and Gallagher to European Micro. This was memorialized in a new agreement, the Shareholders' Cross–Purchase Agreement.

In September 1997, European Micro, Shields and Gallagher convinced the Alnwicks to permit BBE to secure a short-term loan to expand its operations. To induce the Alnwicks' consent, it is alleged that Shields and Gallagher "fraudulently represented" that the loan would accelerate BBE's growth by allowing it to: (i) purchase more computer equipment to dismantle and process into computer parts inventory that ultimately would be sold to new accounts; (ii) hire more employees to service these new accounts; and (iii) develop large deals for BBE involving the EM Group's Premier Dealer Business Program. Notwithstanding these representations, European Micro, Shields, Gallagher and AMCC sought the short-term loan to burden BBE with debt obligations and devalue BBE's business and stock. In October 1997, the Alnwicks agreed to allow BBE to obtain a $350,000 loan from Salinas Investment Company (the "Salinas Loan").

In December 1997, Shields and Gallagher created EM Holdings as the parent

company for European Micro and the other companies in the EM Group. It is alleged that they then attempted to strengthen EM Holdings and its subsidiaries in anticipation of the EM Group IPO and to weaken the financial position of BBE and the Alnwicks.

In March 1998, Shields and Gallagher offered to buy the Alnwicks' interest in BBE. The Alnwicks rejected this offer but agreed to cede daily management control over BBE to Shields, Gallagher and European Micro. Upon gaining control of the daily management of BBE, Shields, Gallagher, European Micro and AMCC introduced new policies and procedures to depreciate the value of BBE and the Alnwicks' interest in that company. In June 1998, Shields and Gallagher completed the EM Holdings' IPO. However, in breach of their previous promises to the Alnwicks, they did not use the IPO proceeds to further develop BBE's business.

In October 1998, at the direction of Shields, Gallagher, European Micro, AMCC and EM Holdings and without the knowledge or consent of the Alnwicks, BBE solicited computer parts business from United States-based companies and United States divisions of foreign companies in the market for buying and selling computer parts in the United States. At the same time, European Micro and European Micro B.V., an entity within the EM Group, aggressively solicited computer parts business in Europe while either Nor'Easter, an unexplained entity, or AMCC or other affiliated EM Group companies solicited computer parts business in the United States. Allegedly, the reason for the shift in the EM Group's core business from computer options to computer parts arose largely from the deterioration in the computer options market and the rise in the computer parts market.

It is further alleged that during the time that the defendants allegedly used BBE to solicit computer parts business in the United States, the defendants entered into a number of unfavorable loan transactions without the Alnwicks' knowledge or permission. Those loans included: (a) EM Holdings' buy-out of the Salinas Loan to BBE on terms significantly more onerous to BBE than the original Salinas Loan; (b) a $250,000 increase in the Rabobank credit line; (c) European Micro's $100,000 loan to BBE in violation of a new capital contribution agreement between European Micro and the Alnwicks; and (d) European Micro's $150,000 loan to BBE in violation of the same agreement. Allegedly, the purpose of these loans was: (1) to continue to damage the financial position of the plaintiffs; and (2) to have EM Holdings and European Micro become the largest combined creditor of BBE.

In June 1999, the Alnwicks sought to terminate the joint venture and dissolve BBE in accordance with the Shareholders' Cross Purchase Agreement. In response, Shields and Gallagher informed them that the necessary paperwork to transfer their shares to EM Holdings had never been filed and thus under Dutch law, the corporation could not be liquidated. On July 16, 1999, Shields and Gallagher offered to purchase the Alnwicks' interest in BBE for $200,000.

In August 1999, Shields and Gallagher informed the Alnwicks of the European Micro loans for the first time and provided them with a report on BBE which set forth the significant debt and encumbrances that the defendants had placed upon the shareholders' equity of BBE without the knowledge or consent of the Alnwicks. On September 17, 1999, Shields and Gallagher reiterated their offer of $200,000, less the Alnwicks' payment obligations concerning the outstanding loans

made to BBE. Shields and Gallagher then threatened the Alnwicks that if they did not agree to the offer, they would seek to collect their loans and reorganize or liquidate BBE. The Alnwicks rejected the offer. In response, Shields and Gallagher threatened that, if the Alnwicks did not accept their offer, they would contact Rabobank as a creditor of BBE and call in all of its loan on October 31, 1999.

On October 8, 1999, BBE and the Alnwicks filed an action against European Micro and EM Holdings in the District Court of Amsterdam, Holland seeking to attach European Micro's shares of BBE and attach all loan proceeds owed to European Micro and EM Holdings pending the outcome of all disputes involving the defendants. That day, the Alnwicks informed the Dutch Court that it intended to file another action against the defendants within four weeks in both the United States and Holland. The Dutch Court then granted a temporary attachment on the condition that BBE and the Alnwicks file their lawsuits in the United States and Holland within 30 days.

On December 31, 2000, the parties liquidated BBE. It is alleged that between the summer and fall of 2001, Shields and Gallagher engaged in a series of "fraudulent conveyances" designed to deplete EM Holdings and European Micro of their assets to the detriment of legitimate creditors, including the Alnwicks and BBP. On August 17, 2001, European Micro's primary lender, NatWest, froze all of its operating accounts and threatened to call due its loans to European Micro as a result of its poor financial condition. In response, Shields made a series of "facially transparent" loans in the amount of $1.9 million to European Micro to satisfy the NatWest loans. EM Holdings also gave European Micro a loan in an unspecified amount. Upon information and belief, Shields and Gallagher intended to liquidate European

Micro for the purpose of: (a) repaying Shields and Gallagher for loans made by them to European Micro; (b) generating cash for EM Holdings to pay off its debts; (c) enabling Shields and Gallagher, the only remaining secured EM Holdings' debt-holders, to privatize a small group of privately-held computer parts businesses; and (d) rendering European Micro judgment proof to prevent the Alnwicks and BBE from pursuing their claims against it.

In July 2001, EM Holdings was not able to satisfy its obligations to creditors, including its senior lender SouthTrust Bank ("SouthTrust") and Gallagher. SouthTrust directed EM Holdings to repay immediately all of its loan by August 15, 2001. On August 21, 2001, EM Holdings repaid its loan to SouthTrust. About that time, Gallagher also directed EM Holdings to repay his loan.

In September 2001, EM Holdings transferred ownership of AMCC to its former shareholders, including Gallagher. This transfer rendered EM Holdings a "defunct company", lacking assets and an operating business. In exchange for this transfer, AMCC and its former shareholders gave a "financially transparent" release to EM Holdings from any of its obligations to AMCC and its former shareholders.

Upon information and belief, on October 12, 2001, the plaintiffs allege that Shields and others formed Square 1 which was a computer parts company founded on the trade secrets and proprietary information that the Alnwicks and BBP provided to the defendants pursuant to their joint venture agreement. Further, upon information and belief, Shields and Gallagher allegedly reinvested the money and assets that they received from the liquidation of European Micro and EM Holdings in connection with the AMCC stock transfer to launch Square 1 and to aggressively fund AMCC in the computer parts market.

## C. The Procedural History

On November 12, 1999, the plaintiffs commenced this action. Initially, the Court dismissed the complaint in its entirety on the ground that the Netherlands was a more convenient forum to litigate this case. *Alnwick,* 137 F.Supp.2d at 112. The Second Circuit then vacated that decision and remanded the case for reconsideration in light of a recent decision concerning the dismissal of actions pursuant to the doctrine of *forum non conveniens. Alnwick v. European Micro Holdings, Inc.,* 29 Fed.Appx. 781, 782 (2d Cir. Mar.15, 2002).

The plaintiffs have now filed an amended complaint containing 17 claims. The first claim alleges that all of the defendants misappropriated trade secrets relating to BBP's business. The second claim alleges that Shields, Gallagher, European Micro and AMCC fraudulently induced the plaintiffs to enter into the joint venture agreement in order to learn the plaintiffs' trade secrets and develop their own independent computer parts business. The third claim alleges that EM Holdings aided and abetted Shields, Gallagher, European Micro and AMCC in their scheme to defraud the plaintiffs in the joint venture. The fourth claim alleges that Shields and Gallagher breached the European Joint Venture Agreement by failing to use their best efforts to help BBE meet its business and financial objectives.

The fifth claim alleges that Shields and Gallagher breached the Shareholders' Capital Contribution Agreement by transferring their BBE shares to European Micro without the Alnwicks' knowledge or permission. The sixth claim alleges that Shields and Gallagher breached the Shareholders' Second Capital Contribution Agreement by failing to make their required capital contributions to BBE. The seventh claim alleges that European Micro breached the Shareholders' Second and Third Capital Contribution Agreements by failing to make its required contributions to BBE. The eighth claim alleges that European Micro breached the Shareholders' Cross–Purchase Agreement by encumbering BBE's shares without the Alnwicks' knowledge and consent and by failing to provide the Alnwicks with advance notice of the First European Micro Loan and the Second European Micro Loan. The ninth claim alleges that European Micro and AMCC breached the European Joint Venture Agreement and the Non–Competition Agreement on various grounds.

The tenth claim alleges that Shields, Gallagher and European Micro breached the Big Blue License Agreement by causing BBE to solicit, buy and sell computer parts in the United States computer parts market using the service mark of "Big Blue" in direct competition against BBP. The eleventh claim alleges that Shields, Gallagher, EM Holdings and AMCC tortiously interfered with various contracts in connection with BBE in that they intentionally induced European Micro to breach those contracts. The twelfth claim alleges that European Micro tortiously interfered with various contracts in connection with BBE in that it intentionally induced Shields and Gallagher to breach those agreements. The thirteenth claim alleges that Shields and Gallagher breached their fiduciary duty to the Alnwicks on various grounds. The fourteenth claim alleges that European Micro breached its fiduciary duty to the Alnwicks on various grounds. The fifteenth claim alleges that European Micro and AMCC aided and abetted Shields' and Gallagher's breach of their fiduciary duty to the Alnwicks. The sixteenth claim alleges that Shields and Gallagher aided and abetted European Micro's breach of its fiduciary duty to the Alnwicks. The seventeenth claim alleges that Shields, Gallagher and AMCC fraudulently transferred the assets of European

Micro and EM Holdings to Square 1 and AMCC in order to render claims against European Micro and EM Holdings uncollectible.

The defendants now move to dismiss the amended complaint in its entirety. In support of this motion, the defendants present a number of contentions. First, the first claim for misappropriation of trade secrets does not adequately allege the prerequisites for that claim. Second, the second claim for fraud fails to satisfy the particularity requirement of Rule 9(b) and the applicable state substantive requirements for fraud. Third, the fifth claim for breach of the Shareholders' Capital Contribution Agreement is invalid on its face because the amended complaint alleges that the plaintiffs consented to Shields' and Gallagher's transfer of their BBE shares to European Micro. Fourth, the ninth claim for breach of the oral Non–Competition Agreement fails to satisfy the statute of frauds. Fifth, the ninth claim for breach of the oral Non–Competition Agreement against AMCC fails to allege consideration. Sixth, the tenth claim for breach of the oral Big Blue License Agreement fails because it depends on the ninth claim which has no merit. Seventh, the eleventh claim for breach of tortious interference with various contracts in connection with BBE fails to allege "but for" AMCC's actions the alleged breaches would not have occurred. Eighth, the seventeenth claim for fraudulent conveyance against Gallagher and AMCC fails to state a claim upon which relief can be granted. Ninth, the remaining causes of action should be dismissed on the ground of *forum non conveniens*. The Court will address each contentions separately.

## II. DISCUSSION

### A. The Standard

A court may grant a Rule 12(b)(6) motion only when " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.' " *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000), *abrogated on other grounds*, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A court must accept as true all of the factual allegations set out in the complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally. *See id.* (citing *Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir.1999)).

Under Rule 12(b)(6), a court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Tarshis*, 211 F.3d at 39 (citing *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991)). Except in certain limited situations, a plaintiff must only provide a "short and plain statement" that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512–513, 122 S.Ct. 992 (citing *Conley*, 355 U.S. at 47, 78 S.Ct. 99). This notice pleading standard expects "liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992.

In support of their motion, the defendants submit affidavits, exhibits and numerous documents which are not found in the pleadings. The Court may not consider this material in a Rule 12(b)(6) motion, *see Tarshis*, 211 F.3d at 39, and declines to convert their motion to one for summary judgment. *See Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25

638

(2d Cir.1988) (stating that a court may decide to convert a Rule 12(b)(6) motion to one for summary judgment for the purposes of considering material outside the pleadings but must first allow each party an opportunity to submit supporting material).

## B. The Misappropriation of Trade Secrets

■ The defendants argue that the first claim for misappropriation of trade secrets fails to state a claim for relief. In a claim of misappropriation of a trade secret, a plaintiff must show that: "(1) [she] possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990). Under New York law, a trade secret means,

> [A]ny device ... which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.... [Six factors are to be considered in determining whether a trade secret exists:] (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir.1999) (internal quotation marks and citation omitted).

The amended complaint alleges that the plaintiffs possessed the following trade secrets:

> (a) customer contacts, lists and leads; (b) supplier contacts, lists and leads; (c) method of inventory acquisition; (d) method of dismantling and testing computer equipment and computer parts inventory, including their training of technical computer staff in connection therewith; (e) method of pricing computer parts inventory, inventory management and movement; and (f) method of operating BBP's business.

It is also alleged that all of the defendants used these trade secrets to compete against BBP in the United States computer parts market which was in violation of the Non–Competition Agreement contained in the European Joint Venture Agreement. These allegations sufficiently plead a claim of misappropriation of trade secrets. Accordingly, the motion to dismiss the first claim is denied.

## C. As to Common Law Fraud

■ The defendants argue that the second claim for fraud fails to satisfy the pleading requirements of Rule 9(b) and the applicable state substantive requirements for fraud. In pleading a claim of common law fraud, the plaintiffs must satisfy the requirements of Rule 9(b) and the elements of the applicable state or federal substantive law. *See* 2 James WM. Moore Et Al., Moore's Federal Practice ¶ 9:03[1][e] (3d ed. 2003) ("[I]n an action in federal district court, even if state law provides the elements of fraud, claimants must plead the circumstances constituting fraud with particularity under Rule 9(b). Therefore, even if conclusory allegations of fraud are sufficient under state law, they will be insufficient in federal district court."). *See also Marcus v. Frome*, 275 F.Supp.2d 496, 504 (S.D.N.Y.2003). The

Court will first address the requirements of Rule 9(b) and then the substantive elements of the applicable state law.

## 1. Rule 9(b)

Rule 9(b) sets forth additional pleading requirements with respect to allegations of fraud. The reason for these requirements are three-fold: (1) to provide the defendant with fair notice of the claims against her; (2) to protect the defendant from harm to her reputation or goodwill as a result of unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). "[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). To satisfy the pleading requirements of Rule 9(b), the plaintiff must plead the circumstances of the fraud with particularity and that the defendant acted with fraudulent intent. Fed.R.Civ.P. 9(b).

### a. Pleading the Circumstances of Fraud

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). In order to satisfy this requirement, the complaint must, " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). As such, this requires the plaintiff to identify which defendant caused each allegedly fraudulent statement to be spoken, written, wired or mailed, and to whom the communication was made; when the communication was made; and how it advanced the fraudulent scheme. *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992). Where there are multiple defendants, Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud. *See DiVittorio*, 822 F.2d at 1247 ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

Count two of the amended complaint alleges that Shields, Gallagher, European Mico and AMCC induced the plaintiffs to enter into the joint venture so that they could: (1) weaken the financial strength of the joint venture through a number of secret self-interested transactions designed to force the plaintiffs to sell their share of the company to them for less than its actual value; and (2) learn the plaintiffs' trade secrets in the computer parts industry and form their own independent computer parts business. In support of this claim, Shields, Gallagher and European Micro allegedly made the following fraudulent misrepresentations to the plaintiffs:

(i) [their] strong presence in the European computer options market would enable BBE to become a significant presence in the international computer parts market;

(ii) [they] would make their extensive network of contacts and product acquisition sources fully available to the joint venture;

(iii) [they] would employ their strong financial relationships with European banks to obtain a necessary line of credit for the proposed joint venture company without any guaranty;

(iv) [they] would utilize their experience and background in European financial matters to benefit the new joint venture company; and

(v) [they] would make their European marketing and prospecting techniques available to BBE.

Count two of the amended complaint also alleges that Shields, Gallagher and European Micro fraudulently induced the plaintiffs to consent to the transfer of Shields' and Gallagher's shares of BBE to European Micro. In support of this claim, Shields, Gallagher and European Micro allegedly made the following fraudulent misrepresentation to the plaintiffs:

[T]he transfer [to European Micro] would prove beneficial to BBE, as the proposed [EM Group] IPO would provide defendant European Micro with the additional capital that it would, in turn, partially utilize to provide the joint venture with (i) access to additional capital sources; (ii) potential financial resources to expand its business through the acquisition of competitors; (iii) greater visibility; and (iv) a significantly stronger position to market and obtain major European accounts for BBE.

The amended complaint alleges that, in reality, Shields, Gallagher, European Micro and AMCC had no intention of using the capital from the IPO to fund BBE. Rather, they intended to use the monies from the EM Group IPO for their own computer options business and their own computer parts business which would adversely affect the financial welfare of the plaintiffs and BBE.

### i. The Inducement to Enter into the Joint Venture

 As to the alleged fraud which induced the plaintiffs to enter into the joint venture, the first requirement of Rule 9(b) is satisfied because the statements that the plaintiffs argue were fraudulent are specified in the amended complaint. The second requirement is however not met because the amended complaint lumps Shields, Gallagher and European Micro to-

gether and fails to specify what each defendant said. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants'.") (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *Doehla v. Wathne Ltd., Inc.*, No. 98–6087, 1999 WL 566311, *17–18 (S.D.N.Y. Aug.3, 1999)) (finding that the plaintiff failed to sufficiently plead the circumstances of fraud where all the defendants were lumped together in a group). Moreover, it does not attribute any of the statements to AMCC.

The third requirement is also not satisfied because the amended complaint does not particularize where and when the statements were made. Rather, it merely alleges that they were made "in the Fall and Winter of 1996 and the first months of 1997." This vague window of time is insufficient to satisfy the pleading standards of Rule 9(b). *See Doehla*, 1999 WL 566311, at *18 (finding that a four-month period during which alleged misrepresentations took place is insufficient to meet the pleading standards of Rule 9(b)); *Skylon Corp. v. Guilford Mills, Inc.*, No. 93–5581, 1997 WL 88894, at *2 (S.D.N.Y. Mar.3, 1997) (finding that "a four-month window during which all of the misrepresentations occurred ... does not satisfy the pleading standard of Rule 9(b).").

Further, the fourth requirement is not met because it does not explain why the statements are fraudulent. Rather, the statements are vague and conclusory. They do not identify the contacts that the defendants were to make available to BBE. Nor do they identify the banks that the defendants were to employ for a line of credit for BBE. Also, the allegations that the defendants promised to utilize their experience and background in European finance to benefit BBE and that they

would make their European marketing and prospecting techniques available to BBE are general assurances and efforts. *See Arista Techs., Inc. v. Arthur D. Little Enters., Inc.*, 125 F.Supp.2d 641, 647 (E.D.N.Y.2000) (stating that "vague allegations of unstated misrepresentations, assurances, and efforts" are insufficient under Rule 9(b)). Finally, count two of the amended complaint states, in conclusory fashion, that these statements were false and misleading.

#### ii. The Inducement to Permit the Transfer of Stock Shares

As to the alleged fraud which induced the plaintiffs to consent to the transfer of BBE shares, the first requirement is satisfied because the statement that the plaintiffs argue was fraudulent is specified in the amended complaint. The second requirement is not met because the amended complaint lumps Shields, Gallagher and European Micro together and fails to specify what each said. Again, the amended complaint does not attribute the statement to AMCC. The third requirement is also not met because the amended complaint does not particularize where and when the statement was made. Rather, it alleges that it was made between May 1997 and August 1997. This vague four-month period of time is insufficient to satisfy the pleading standards of Rule 9(b). *See supra* Part II.B.1.a.i.

However, the fourth requirement is met because the amended complaint explains why this statement was fraudulent. This statement is not vague. Rather, it states that the defendants promised to use some of the capital from the EM Group IPO to strengthen the resources of BBE. It alleges further that the defendants never intended to use this capital to help BBE. Instead, they intended to use the capital for their own computer options and computer parts business. As such, the amended complaint adequately explains why this statement is fraudulent. However, because prerequisites two and three of Rule 9(b) are not satisfied, the circumstances of this alleged misrepresentation are insufficiently plead. Based on the foregoing, all of the alleged misrepresentations in count two of the amended complaint fail to plead the circumstances of fraud with the particularity required under Rule 9(b).

#### b. Pleading Fraudulent Intent

As well as specifying the circumstances that constituted the fraud "with particularity," the plaintiff must allege facts which give rise to a strong inference of fraudulent intent. *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir.1996) (citing *Shields*, 25 F.3d at 1128). However, this *scienter* requirement need not meet the more rigorous standard of Rule 9(b). Rather, Rule 9(b) permits the plaintiff "to allege fraudulent intent generally." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995). Nevertheless, the plaintiff must still " 'provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference' of fraudulent intent." *Id.* (citing *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F.Supp. 926, 935 (S.D.N.Y.1989) (citation omitted)).

In order to satisfy the scienter requirement, the plaintiff must allege either: (1) facts which demonstrate that the defendant had both the motive and a clear opportunity to commit the fraud, or (2) facts which show strong circumstantial evidence of conscious behavior or recklessness by the defendants. *Id.* Neither the defendants nor the plaintiffs discuss whether the amended complaint sufficiently pleads fraudulent intent. Nevertheless, the Court finds that the amended complaint adequately pleads facts showing that the defendants had the requisite motive and opportunity to commit fraud.

### i. Motive

■ "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Shields*, 25 F.3d at 1130. To determine whether motive is adequately alleged, courts must "assume that the defendant is acting in his or her informed economic self-interest." *Id.* Courts may not base an allegation of motive on the desire of an executive to increase her company's financial health, her desire to achieve incentive compensation, or her desire for continued employment. *Id.* (citations omitted).

Here, the amended complaint sufficiently alleges motive. It alleges that the defendants engaged in a scheme to decrease the value of BBE in order to purchase the plaintiffs' interest in the company at a low value. It also alleges that the defendants entered into the joint venture with the intention of learning the plaintiffs' trade secrets and using them to form their own independent computer parts business in direct competition with the plaintiffs.

### ii. Opportunity

A "clear opportunity" to commit fraud means that the defendant is "well positioned to carry out the fraudulent transaction." *Powers*, 57 F.3d at 185; *see also Shields*, 25 F.3d at 1130 (stating that "[o]pportunity ... entails the means and likely prospect of achieving concrete benefits by the means alleged."). A defendant who has the necessary trust and authority to commit fraud is well positioned. *Turkish v. Kasenetz*, 27 F.3d 23, 28 (2d Cir.1994) (holding that, as fiduciaries of the plaintiff trust, defendants had a clear opportunity to commit fraud). "Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading stan-

dard." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990).

It is undisputed that Shields, Gallagher and European Micro were in the position to commit fraud in this case. They agreed to form the joint venture with the plaintiffs. Shields and Gallagher were partners and each were 25% shareholders in BBE. As such, they were in the position to engage in a scheme to defraud the plaintiffs in connection with the joint venture. Since the amended complaint alleges motive and a clear opportunity to commit fraud, it sufficiently pleads fraudulent intent. However, because the amended complaint fails to adequately plead the circumstances of the fraud, count two cannot survive.

Based on the foregoing, count two is dismissed for failure to comply with the pleading requirements of Rule 9(b). To complete the record, the Court will address the defendants' remaining argument that the allegations of fraud are insufficient under New York law.

### 2. New York Law

■ New York law governs this dispute because the parties assume that it applies here. *See Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989) ("[I]mplied consent to use a forum's law is sufficient to establish choice of law.") (citations omitted). Under New York law, the elements of a claim of fraud are that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995) (citing *Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir.1994)).

■ The defendants argue that the first element is not satisfied because the alleged misrepresentations are expectations and opinions or involve the failure to perform future acts. In the first instance, it is well-settled that allegations that a party entered into a contract with the intention of breaching the contract are insufficient to support a claim of fraud under New York law. *See Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 401 (2d Cir.2001) (holding that a representation that "is merely a statement of intent to perform under the contract, cannot constitute fraud in New York."); *Bridgestone/ Firestone, Inc., v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir.1996) (holding that a fraud claim where the alleged misrepresentations "amount[ed] to little more than intentionally-false statements . . . indicating [defendant's] intent to perform under the contract.").

As noted above, count two of the amended complaint alleges that Shields, Gallagher and European Micro made the following representations to induce the plaintiffs to enter into the joint venture agreement:

(ii) [they] would make their extensive network of contacts and product acquisition sources fully available to the joint venture;

(iii) [they] would employ their strong financial relationships with European banks to obtain a necessary line of credit for the proposed joint venture company without any guaranty;

(iv) [they] would utilize their experience and background in European financial matters to benefit the new joint venture company; and

(v) [they] would make their European marketing and prospecting techniques available to BBE.

These representations claim that Shields, Gallagher and European Micro entered into the joint venture intending to breach the agreement. As such, they are insufficient to support a claim of fraud under New York law.

■ Second, generalized allegations that the defendants were too optimistic when they projected future prospects is insufficient to support a claim of fraud. *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir.1982) ("[E]conomic prognostication, though faulty, does not, without more, amount to fraud.") (internal quotation marks omitted). Count two of the amended complaint alleges that Shields, Gallagher and European Micro represented that their "strong presence in the European computer options market would enable BBE to become a significant presence in the international computer parts market." This representation is a highly optimistic statement concerning projected future prospects. As such, it is insufficient to support a claim of fraud under New York law.

Third, " '[w]hile [m]ere promissory statements as to what will be done in the future are not actionable, . . . it is settled that, *if a promise was actually made with a* preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact upon which an action for recision [based on fraudulent inducement] may be predicated.' " *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir.1992) (quoting *Sabo v. Delman*, 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906 (N.Y.1957)) (emphasis in original).

Count two of the amended complaint alleges that Shields, Gallagher and European Micro stated to the plaintiffs that their transfer of BBE shares to European Micro would prove beneficial to BBE because the proposed IPO would provide European Micro with the additional capital to provide BBE with more resources. It further alleges that at the time the representation was made they "had no intention of

infusing BBE with capital from the proposed IPO." This representation is "an allegation of present fact which gives rise to a claim of fraudulent inducement." *Id.* (citing *Deerfield Comms. Corp. v. Cheseb-rough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986)). As such, this representation is sufficient under a theory of fraudulent inducement. However, because this representation does not satisfy Rule 9(b), it must be dismissed. *See Hoffenberg v. Hoffman & Pollok,* 248 F.Supp.2d 303, 310 (S.D.N.Y.2003) (stating that the pleader must satisfy the elements of fraudulent inducement under New York law and Rule 9(b)).

Based on the foregoing, the second claim for fraud against Shields, Gallagher, European Micro and AMCC is dismissed.

### D. The Shareholders' Capital Contribution Agreement

The defendants contend that the fifth claim for breach of the Shareholders Capital Contribution Agreement is invalid on its face because there was no breach of that agreement. Count five of the amended complaint alleges that Shields and Gallagher breached this agreement by transferring their BBE shares to European Micro without the Alnwicks' knowledge and consent. The defendants submit no case law to support dismissal of this claim based on consent. Accordingly, at this stage of the litigation, the motion to dismiss the fifth claim is denied.

### E. The Oral Non–Competition Agreement

The defendants argue that the ninth claim for breach of the oral Non–Competition Agreement violates the statute of frauds under New York law. Under the statute of frauds, an agreement that cannot be performed within one year is void unless it is in writing and signed by the party to be charged. N.Y. Gen. Oblig. Law § 5–701(a) (McKinney 2003). Courts analyze oral agreements closely and the statute of frauds does not apply when there is "any possible means of performance within one year." *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 455, 483 N.Y.S.2d 164, 472 N.E.2d 992 (N.Y.1984). If the oral contract is terminable at will, then the statute of frauds is not implicated. *Cron v. Hargro Fabrics, Inc.,* 91 N.Y.2d 362, 367, 670 N.Y.S.2d 973, 694 N.E.2d 56 (N.Y.1998). Nevertheless, where a party does not have the option of terminating the contract but, instead, would be in breach of the agreement, the statute of frauds applies. *Kirsch Beverages,* 63 N.Y.2d at 456, 483 N.Y.S.2d 164, 472 N.E.2d 992.

Count nine of the amended complaint alleges that European Micro and AMCC breached the European Joint Venture Agreement and the oral Non–Competition Agreement on various grounds. The amended complaint further states that the oral Non–Competition Agreement, which was a part of the European Joint Venture Agreement, provided that subject to certain limited exceptions, BBE could not solicit, buy or sell computer parts in the United States; BBE could not solicit, buy or sell computer options in Europe; Shields, Gallagher and the EM Group companies could not solicit, buy or sell computer parts in Europe or the United States; and neither the Alnwicks not BBP could solicit, buy or sell computer parts in Europe.

Where, as here, there is no definite term of duration for the joint venture, it may be terminated at will. *See Scholastic, Inc. v. Harris,* 259 F.3d 73, 86 (2d Cir.2001) ("Absent any definite term of duration, the joint venture arguably is one at will.") (citing *Shandell v. Katz,* 95 A.D.2d 742, 743, 464 N.Y.S.2d 177 (1st Dep't 1983)); *Artco, Inc. v. Kiddie, Inc.,* 88–5734, 1993 WL 962596, *8 n. 6 (S.D.N.Y. Dec.28, 1993)

("When there are no writings sufficient to satisfy the statute of frauds, an oral joint venture, if wholly or partially executed, will be deemed terminable at will."); *Hooker Chem. & Plastics Corp. v. Int'l Minerals & Chem. Corp.*, 90 A.D.2d 991, 991–92, 456 N.Y.S.2d 587, 589 (4th Dep't 1982) (noting that where a joint venture or "a partnership is not limited as to time and 'there is nothing to show the intention of parties as to its duration,'" it is an at will agreement) (citation omitted).

Because the joint venture was an at will agreement, the parties could have terminated it within one year of its making. *Artco*, 1993 WL 962596, at *8 n. 6 ("New York law is clear that a venture at will can be terminated without liability for breach of contract by any partner at any time by any act which evidences intent to terminate the association.") (citing N.Y. Partnership Law § 62(1)(b)); *Ebker v. Tan Jay Intern. Ltd.*, 741 F.Supp. 448, 469 (S.D.N.Y.1990) ("As a partner at will, [the defendant] had the right to terminate the joint venture, and his termination of the partnership was not legally actionable."). It therefore follows that the oral Non–Competition Agreement, which was a distinct part of the joint venture agreement, could have been terminated at anytime after the joint venture was terminated. As such, the oral Non–Competition Agreement could have been performed within one year and thus does not fall within the statute of frauds. Accordingly, the motion to dismiss the ninth claim is denied.

### F. The Oral Non–Competition Agreement

The defendants contend that the ninth claim for breach of the oral Non–Competition Agreement against AMCC is insufficient because AMCC was never a party to the joint venture agreement and that the claim fails to plead that AMCC received any consideration for entering into that agreement. Viewing the amended complaint in the light most favorable to the plaintiffs, the Court finds that it sufficiently pleads a claim against AMCC for breach of the oral Non–Competition Agreement. The amended complaint alleges that AMCC, as a member of the EM Group, was a party to the oral Non–Competition Agreement. As a party to that agreement, AMCC received consideration for entering into the agreement, namely the plaintiffs' promise not to solicit, buy and sell computer parts in Europe. Accordingly, the motion to dismiss the ninth claim against AMCC is denied. *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir.1996) (finding that the question of defendant's liability under the contract is a disputed issue, despite his argument that he is not a party to the agreement, which is not properly decided on a motion under Rule 12(b)(6)).

### G. The Big Blue License Agreement

The defendants assert that the tenth claim for breach of the oral Big Blue License Agreement fails to state a claim for relief because it depends on the ninth claim. In particular, the defendants argue that the breach of the oral license agreement depends on the enforceability of the oral Non–Competition Agreement. As noted above, at this stage of the litigation, the oral Non–Competition Agreement is a valid agreement. Accordingly, the motion to dismiss the tenth claim is denied.

### H. The Tortious Interference with Contract

The defendants argue that the eleventh claim for tortious interference with contract does not allege that "but for" the activities of AMCC the breach would not have occurred and does not allege the acts that AMCC committed which form the basis of this claim. In a claim of tortious interference with contract under New

York law, the plaintiff must plead: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional, unjustified procurement of a breach of the third-party contract; and (4) ensuing damages. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996). The plaintiff must also " 'allege that there would not have been a breach but for the activities of defendants.' " *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (internal quotation marks omitted). As such, the plaintiff must allege that the defendant was the motivating force behind the alleged breach. *See id.*

■■■ The allegations in count eleven against AMCC are insufficient. In the first instance, the plaintiffs do not allege "but for" AMCC's activities, European Micro would have breached the various contracts concerning the joint venture agreement. There are no allegations how AMCC contributed to European Micro's breach of those agreements. Second, the amended complaint alleges that AMCC was a party to some of those agreement. As such, a claim of tortious interference is not permitted with respect to those agreements. *See NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F.Supp.2d 134, 147–48 (S.D.N.Y.2003) ("[A] claim of tortious interference cannot be raised against a defendant who is a party to the contract.") (citing *Kosson v. Algaze*, 203 A.D.2d 112, 113, 610 N.Y.S.2d 227, 228 (1st Dep't 1994)). Accordingly, the motion to dismiss count eleven against AMCC is granted.

## I. The Fraudulent Transfer of Assets

■■■ The defendants contend that the seventeenth claim for fraudulent transfer of assets against Gallagher and AMCC fails to state a claim for which relief can be granted. Count seventeen alleges that Shields, Gallagher and AMCC transferred all of the assets of European Micro and EM Holdings to Square 1 and AMCC in order to deprive the plaintiffs of any potential judgment.

It is settled that a claim of fraudulent conveyance must satisfy the pleading requirements of Rule 9(b). *See Atl. Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir.1987). As with the claim of fraud, the fraudulent conveyance claim is not pled with sufficient particularity. First, the plaintiffs do not identify the assets which were allegedly transferred. Second, the date of the alleged transfer, namely on or about 2001, is vague and insufficient to meet the pleading standards under Rule 9(b). *See Doehla*, 1999 WL 566311, at *18 (finding that a four-month period where alleged misrepresentations took place is insufficient under Rule 9(b)). Accordingly, the motion to dismiss the seventeenth claim is granted.

## J. As to *Forum Non Conveniens*

### 1. The Standard

■■■ In a *forum non conveniens* analysis, a court must first determine what level of deference to accord a plaintiff's choice of forum. *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir.2002) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir.2001)). After this is decided, a court must consider whether there is an adequate alternative forum. *Iragorri*, 274 F.3d at 73. If one exists, a court must then weigh the relative convenience of the forums by evaluating certain private and public interest factors. *Id.* "[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Id.* at 74.

### a. The Deference Owed to the Plaintiff's Choice of Forum

The Second Circuit has established a "sliding scale" approach to determine the proper deference to accord a plaintiff's choice of forum. *Id.* at 71. Under that scale, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States ... [the greater deference must be accorded plaintiff's choice of a forum and] the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*" *Id.* at 72.

The plaintiffs filed this case in the forum where they have their principal place of business, the Eastern District of New York. As such, the Court must accord this choice of forum great deference. *See Iragorri,* 274 F.3d at 71 ("[P]laintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum.") (citations omitted); *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 101–102 (2d Cir.2000) (stating that a plaintiff's choice of forum increases as her ties to the forum increase); *Murray v. British Broad. Corp.,* 81 F.3d 287, 290 (2d Cir.1996) (stating that a domestic plaintiff's choice of forum deserves more deference than a foreign plaintiff's); *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 n. 23, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (indicating that the choice of forum by its citizens and residents deserves greater deference than a stranger's choice); *Koster v. (Am.) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947) ("[A] real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.").

### b. The Alternative Forum

Next, the Court must determine whether an adequate alternative forum exists. "An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998) (citing *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252). It is undisputed that the Netherlands is an adequate alternative forum.

### c. The Balancing of the Interest Factors

Having determined that an adequate alternative forum exists, the Court must now weigh the private and public interest factors to decide which forum-the Eastern District of New York or the Netherlands-is more convenient and serves the interests of justice. *Iragorri,* 274 F.3d at 73.

The private interest factors are: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive. *Id.* at 73–74. The public interest factors are: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community. *Id.* at 74.

The private interest factors favor the plaintiffs. The parties have engaged in extensive discovery in this action. *See Alnwick,* 29 Fed.Appx. at 783–84 ("It has been observed that 'whenever discovery in a case has proceeded substantially so that the parties already have invested much of the time and resources they will expend before trial, the presumption against dismissal on the grounds of *forum non conveniens* greatly increases.' "). As noted by

the Second Circuit, Shields and Gallagher, two United States citizens, are arguably the most important witnesses. *Id.* at 783–84. The parties here will be able to compel the testimony of foreign individuals through letters rogatory and other discovery devices. *See DiRienzo*, 294 F.3d at 30. Unlike here, courts in the Netherlands have the authority to prevent the plaintiffs from testifying live in connection with their fraud claims where an issue can be resolved on the written submissions. Because many documents are in English and Dutch, the translation of documents will be required in either forum. The fact that the plaintiffs filed an action in Holland first is not of great weight because they commenced that action to prevent the defendants from carrying out their threats of rendering BBE insolvent. Finally, the plaintiffs have pleaded this case as one arising from a scheme to exploit a joint venture in the computer parts industry. As such, the claims of fraud must be given great weight in this analysis. *Alnwick*, 29 Fed.Appx. at 784 (noting that United States courts have a strong relation to litigation where fraud is allegedly committed against its residents).

The public interest factors favor the plaintiffs. The parties negotiated and entered into the joint venture agreement in the United States. The defendants' due diligence surrounding the joint venture was allegedly conducted in New York. The individual defendants each reside in this country. New York law governs this dispute. And, finally, this case would not burden jurors by having them decide a case that does not impact their community because the plaintiffs have their principal place of business in this district.

Based upon a review of the private and public interest factors in light of the great deference accorded to the plaintiffs' choice of their home forum, the Court finds that the defendants have failed to show that the Netherlands is a more convenient and just forum than the Eastern District of New York. Accordingly, the motion to dismiss the amended complaint on the ground of *forum non conveniens* is denied.

### K. Leave to Amend

The plaintiffs seek leave to file a second amended complaint in order to clarify the definition of AMCC. The defendants do not oppose this application. Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint "shall be freely granted when justice so requires." *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). The Court grants the plaintiffs leave to file a second amended complaint to clarify the definition of AMCC. In addition, because today is the first occasion that the Court has addressed the sufficiency of the pleadings, it grants the plaintiffs leave to amend all of the claims that are dismissed in this decision. The second amended complaint must be filed within 30 days from the date of this order. Failure to file within this period of time will render the dismissal of those claims to be with prejudice.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the motion to dismiss the second claim for fraud against Shields, Gallagher, European Micro and AMCC, the eleventh claim for tortious interference with contract against AMCC and the seventeenth claim for fraudulent transfer of assets against Gallagher and AMCC is granted; and it is further

**ORDERED,** that the motion to dismiss the remaining claims is denied; and it is further

**ORDERED,** that the plaintiffs are granted leave to file a second amended complaint within 30 days from the date of this order and that the failure to file within this time period will render the dismissal of the second, eleventh and seventeenth claims with prejudice; and it is further

**ORDERED,** that the parties are directed to contact United States Magistrate Judge Arlene R. Lindsay forthwith to schedule the completion of discovery; and it is further

**ORDERED,** that the parties are directed to select a jury in this 1999 lawsuit on November 12, 2003 at 9 a.m.

**SO ORDERED.**